Opinion issued February 13, 2003








In The

Court of Appeals

For The

First District of Texas






NO. 01-01-00597-CV






IN THE MATTER OF THE GUARDIANSHIP OF

JEANETTE LYNN HINRICHSEN






On Appeal from Probate Court No. 3

Harris County, Texas

Trial Court Cause No. 248,500






O P I N I O N

 In this guardianship case, we must determine whether the evidence is legally
and factually sufficient to support the trial court's finding that the applicant/appellee,
Harris County Guardianship Program ("the Program"), proved by clear and
convincing evidence that respondent/appellant, Jeanette Lynn Hinrichsen, was
incapacitated, that guardianship was in her best interest, and that her rights would be
protected by appointment of a guardian of her person. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND


 Hinrichsen, an adult in her sixties, has been diagnosed with chronic paranoid
schizophrenia and has been in and out of psychiatric hospitals over the past 15 years. 
On November 28, 2000, the Harris County Guardianship Program (1) filed an
application for guardianship of the person of Hinrichsen in the trial court. Hinrichsen
had been previously under full guardianship by the Program from 1994 to 1996. 
While under that guardianship, she was transported to her doctor appointments by
Harris County, and she took her medication regularly. Her condition stabilized and
her mental health improved to the point that the guardianship was removed.

 On May 1, 2001, an evidentiary hearing was held before the trial judge on the
November 28 application for guardianship. The evidence showed that, in November
2000, Hinrichsen was temporarily living at the Harris County Psychiatric Center, (2)
where she was seen from November 8, 2000 through December 18, 2000 by Dr.
Nelson Gruber. Dr. Gruber is a board-certified, licensed psychiatrist with additional
qualifications in geriatric psychiatry, an associate professor for 12 years at The
University of Texas Health Science Center at Houston's Department of Psychiatry,
and an attending physician at the Harris County Psychiatric Center. 

 Dr. Gruber testified at the hearing by telephone that he had treated Hinrichsen
in February 1999 and that he had reviewed Hinrichsen's records from her February
1999 hospitalization. He also had reviewed her records from Rusk State Hospital, (3)

which went back to 1989. The Rusk records made reference to symptoms of
Hinrichsen's illness as early as the 1970s. Dr. Gruber last examined Hinrichsen on 
December 18, 2000, and he diagnosed her with schizophrenia and paranoia. Dr.
Gruber testified that this illness can develop in some people as early as their teens,
but that it was not unusual to develop in one's thirties or forties. It is the kind of
disease that can have a relapsing and remitting course, but the tendency to develop
the symptoms is throughout the lifetime. Dr. Gruber stated that Hinrichsen had been
willing to comply with a court order to take Prolixin while at the Harris County
Psychiatric Center in November and December 2000, but that she continuously
refused to take Elura, an anti-psychotic agent that they wanted her to take. On
December 19, 2000, Hinrichsen was very ill and was transferred to Rusk State
Hospital for further treatment, where she remained until January 25, 2001.

 After her discharge from Rusk State Hospital, Hinrichsen was treated by Dr.
Daniel Coppersmith, an employee of the Mental Health and Mental Retardation
Authority of Harris County, beginning on February 9, 2001. Dr. Coppersmith is a
board-certified, licensed psychiatrist. Dr. Coppersmith testified at the hearing by
telephone that he treated Hinrichsen in 1995 and 1996, and more recently saw
Hinrichsen on February 9, February 23, March 26, and April 9, 2001. Dr.
Coppersmith assessed Hinrichsen's mental functioning the last time he saw her on
April 9, 2001 as "floridly psychotic" and delusional, and noted that she still refused
to take her medication. At that time, Hinrichsen's symptoms included delusions of
having a brain tumor which she thought was caused by her medication. Dr.
Coppersmith diagnosed Hinrichsen as having paranoid schizophrenia, and testified
that medication exists to treat Hinrichsen's illness, which she normally should take
by injection every two to four weeks. 

 Although she consented to medication on February 9, on Hinrichsen's February
23 visit with Dr. Coppersmith, she was still paranoid and believed the water in her
apartment was poisoned. Dr. Coppersmith testified that Hinrichsen's symptoms are
fairly severe when she is not taking her medication, but that she is stabilized by
regularly taking medication such that one would not know she had psychiatric
problems. Dr. Coppersmith testified that, by the March 26 visit, Hinrichsen was
refusing to take medication. At the time of the May 1 hearing, the last time
Hinrichsen had taken her medication was at either the February 9 or February 23 visit
with Dr. Coppersmith.

 Dr. Coppersmith testified that when Hinrichsen did not take her medication
regularly her condition would deteriorate and that she would require hospitalization
as psychotic. Dr. Coppersmith stated that, in his opinion, Hinrichsen was totally
incapacitated, and that the appointment of a guardian was in Hinrichsen's best
interest. Dr. Coppersmith further opined that, if Hinrichsen was under a guardianship
and the Harris County van brought her to her medical appointments, she would be
able to maintain an outside-the-hospital environment and could probably continue
living in her garage apartment with minimal supervision. Dr. Coppersmith thought
that, like the previous time Hinrichsen had a guardian, the appointment of a guardian
to provide support and regular transportation to get her medication would be
beneficial to her. Coppersmith testified that, when Hinrichsen is on medication for
a period of time, she is a delightful person who writes poetry and takes care of
herself, and one would hardly know she had any psychiatric problems. Dr.
Coppersmith testified that, when he was treating Hinrichsen in 1995 and 1996, when
she had a guardian and was getting her medication regularly, she was stabilized. 
Coppersmith wrote the court in 1996 to opine that Hinrichsen was no longer
incapacitated because he felt that she had been stable long enough that she would
continue to take her medication.

 The Program representative testified that she had reviewed Hinrichsen's file
from the Program from 1994 to 1996, that she interviewed Hinrichsen's family
members, and that she met with Hinrichsen. The representative testified that, in her
opinion, while Hinrichsen was previously under guardianship her mental health
improved to the point that there were no reports of any hospitalizations or other
problems because Hinrichsen took her medication at that time. The representative
also testified that, although many of Hinrichsen's family members lived in Houston,
none wanted to become her guardian because each believed that Hinrichsen would
not listen to them, but would listen to a guardian from the Program. The
representative further testified that a less invasive alternative to guardianship had
been attempted to bring Hinrichsen into compliance with her medication regime, but
that Hinrichsen refused to cooperate. In the representative's opinion, Hinrichsen's
family thought that her functioning and quality of life had been improved under the
previous guardianship and that she would benefit from guardianship again.

 The Program representative further testified that Hinrichsen had been in and
out of psychiatric hospitals for the past 15 years and that, if Hinrichsen is not
medication-compliant, her symptoms become so severe that she has to be
institutionalized. In fact, Hinrichsen had been hospitalized twice since the Program
received a referral for guardianship in November 2000. The Program representative
testified that, when she visited with Hinrichsen at the Harris County Psychiatric
Center in November and December 2000, Hinrichsen was psychotic. However, the
representative also testified that, when she visited Hinrichsen at her apartment on
April 20, 2001, she was less psychotic, she was doing her laundry, she kept up her
home, she appeared well-groomed, and she appeared to be able to take care of her
physical needs.

 Hinrichsen's younger brother, Michael Hess, testified that the family has been
"fighting this battle for about 20 years" and that the two years she was under
guardianship were "just great," because Hinrichsen maintained a constant level of
medication. Hess testified that his sister could "keep house," but that she was
"fighting a battle in her head" to which the family could not relate. Hess noted that,
after the previous guardianship was removed, his sister ran away to Alabama and was
living out of garbage cans, and that he believed a guardianship was in Hinrichsen's
best interest. 

 Hess testified that, although his sister thought otherwise, his sister held no
patents to his knowledge, and he believed they were figments of her imagination. 
Hess testified that, in the six months before the hearing: Hinrichsen was constantly
losing things, and then claiming that someone had broken into her house and stolen
from her; she had been leaving little things scattered all over her apartment, like
something hanging from a piece of thread or a wad of cotton, to keep spirits away;
she claimed that she owned her garage apartment, which is actually owned by Mr.
Hess; and, on one recent occasion, she walked unannounced into Hess's tenants'
home, located just in front of her garage apartment. Hess said that, during the past
few months, his sister had been able to take care of herself and her finances, but she
needed medication.

 Hinrichsen's father, E.L. Hess, also testified at the hearing. E.L. Hess lives
approximately two miles from Hinrichsen. E.L. Hess testified that he wants his
daughter to have a guardianship again because it worked well the previous time and
is in her best interest. E.L. Hess also testified that "I've had 20 years of it and I'm
through," and that the appointment of the Program as Hinrichsen's guardian would
protect her. In his words, "[t]his guardianship has got to be. It's the only thing that
will work." However, E.L. Hess also testified that Hinrichsen goes to the grocery
store and church by herself, does gardening by herself, and gets around on the bus
better than he does. He also testified that Hinrichsen is able to feed, clothe, and
shelter herself, and take care of her own finances. E.L. Hess also testified that he
thought a guardian should have control over Hinrichsen's money because, if "you
don't control her money, she won't take the medication." He also testified that she
would flee if she had control of her own money, and that he had previously brought
her back from three different states.

 Hinrichsen's son, John David Hinrichsen, also testified at the hearing. John
Hinrichsen testified that he believed a guardian would be good for his mother, and
that he saw a big difference in Hinrichsen's functioning when she was on her
medication. Mr. Hinrichsen testified that his mother does not want to take her
medication, and that a guardianship would be in her best interest. Mr. Hinrichsen
also testified that his mother was able to handle her own finances when she was on
regular medication. Mr. Hinrichsen testified that his mother had twice saved up her
money from her monthly social security checks in order to flee from Texas and that
she had no support while she was absent from the state because she failed to receive
her social security checks.

 Hinrichsen's sister, Leslie Purvis, also lives in Houston. Ms. Purvis testified
that she felt Hinrichsen was able to take care of herself physically, but was not able
to handle her financial affairs. She also testified that she believed a guardianship was
in her sister's best interest, and that "[w]e have a long history of Lynn's problems and
the only time that she was functional and safe and well was when she had a
guardian."

 Hinrichsen testified that she did not need nor want to take any medication, that
she was not currently being treated by a doctor, and that her doctor had not prescribed
a medication called Prolixin for her. During the course of the hearing, Hinrichsen
interrupted the proceedings repeatedly, walked out of the courtroom on two
occasions, and often made very insulting and sometimes bizarre comments. During
her opening statement, she claimed that she knew Judge Scanlan, and stated that
Judge Scanlan was not the real Judge Scanlan, and thus the proceedings were
"invalidated in toto." During her testimony, she claimed that, although Prolixin had
been prescribed for her in the past, it was no help and that it causes cirrhosis of the
liver and acute renal failure. When asked whether she had been to the Harris County
Psychiatric Center, she stated: "Over time my father takes a whim to please his
masters. He is the servant of servants, regularly . . . his whole life." Hinrichsen
testified that her father was told to put her in the Harris County Psychiatric Center
and that "he does it every time he chooses." She recalled being under guardianship
previously, and complained that the guardian failed to pay her water bill.

 When she was questioned about whether she thought there were any problems
that led to her being admitted to the Harris County Psychiatric Center, Hinrichsen
stated:

 The deputy told me the reason they came to me at 8:30 p.m.
election night - election night of this past year, and to my open door
with a crowbar in my father's hand - a crowbar in his hand at my open
door at 8:30 p.m. the election night.


 And the deputy - I said, "What do you want, Sheriff?" And the
deputy says, "Apparently you are a liberal who has supported Gene
Green and Albert Gore for years. And we do not want any liberals in
this neighborhood."


 That is what they told me was the reason I had to go to Harris
County Psychiatric Center. And that is similar to all the other nonsense. 
Usually they don't give me any reason whatsoever. No reason. This
time they fancied me with a reason. Isn't that nice?


Hinrichsen stated that she did not need to be on medication, and that she is allergic
in her heart, arteries, brain and scalp to all drugs, that all drugs cause her heart
attacks, coronary thrombosis, cerebral hemorrhages and strokes every time she takes
them. 

 Hinrichsen also stated that she did not want to have a guardian and that the
reason all of her family members were in favor of her having a guardian was that they
wanted her money from her inventions, books, movies and musicals. She claimed to
be a successful movie and musical writer, but testified that she did not get paid
because her family gets the money. Hinrichsen claimed to be a published author of
five books and articles in "little magazines" and The New York Times. She believed
that Texas statutes and case law from the United States Supreme Court obtained last
year as a result of her attorneys' efforts, protects her, as a published author, from
having to take drugs. She further stated her belief that she has made seven major
inventions which she listed as:

 Sub-seas of plastic poles to preserve sea life and pollution of
Mississippi, etc. Dictaphone translator for bilingual cultures. Red clay
aluminum for inexpensive housing. Promote kemp to burn feces to ash
to prevent mercuring [sic] soot pollution of the waterways. Auxiliary
subs for select areas of the Arctic to bring water to the dry western areas
of the country to employ the unemployed for farming. Irrigation for
Texas, Mexico and North Africa. Convection currant [sic] funds to
bring rain by oxygen flow. Red clay aluminum. Man-made islands.


Hinrichsen also claimed that she holds several patents, but that it was unclear to her
what happened to the royalties.

 She also claimed that her father often steals and murders, that he is wanted for
murder in Reno, Nevada and Alabama, and that he and her brother Mike are ordered
to take Haldol everyday and are the most paranoid and schizophrenic patients their
doctors have ever seen. When asked to verify that she did not want a guardian, she
replied "famous biscuits do not need a guardian," apparently in reference to her
earlier testimony that she was a good cook and that her biscuits and cornbread were
famous. Hinrichsen also claimed Dr. Gruber was not a doctor and had not been to
medical school, and that Dr. Coppersmith used an alias and was not Dan
Coppersmith.

 Hinrichsen interrupted the testimony of Dr. Gruber to claim he was not aware
of the definition of paranoia because she was not afraid of anyone or anything and
was not suspicious. She then claimed Dr. Gruber was a paranoid schizophrenic.
During the testimony of others, Hinrichsen interrupted the proceedings to claim that
the medication on February 9 had given her a stroke, that guardian ad litem Hall
wanted the money from her inventions, and that he was most ambitious for a "faggot"
and a drug addict and a communist" and a "parole violator" and an "alcoholic." 
Hinrichsen also interrupted the testimony of the representative of the Program to
claim that the representative had been brought before a court in Austin for
schizophrenia and prostitution, and that the representative uses illegal drugs. 
Hinrichsen further claimed to work for the Drug Enforcement Administration, and
interrupted her sister's testimony to call her sister a "whore in back room bars."

 There was also testimony indicating that Hinrichsen's memory was good, and
that she could do many of the tasks necessary to care for herself. Hinrichsen knew
her birthplace, birthday, and the members of her immediate family, and she could
identify her congressman, senators, the governor, and the President. There was also
evidence that she shops, cooks, and cleans; grooms and dresses herself; puts on
makeup; and uses public transportation to get to the hairdresser, church, and court. 
Hinrichsen testified that she had been to college, but lacked a degree in literature by
one hour. She also testified that she had been married and had one child who lived
in Alabama, and that she believed her divorce from her husband, approximately 20
years ago, was not valid. There was also evidence that Hinrichsen maintained a
checking account and managed her own finances adequately. Hinrichsen lives rent-free in a garage apartment owned by her brother and receives social security and
Medicaid benefits.

 At the conclusion of the hearing, Judge Scanlan found that Hinrichsen was
mentally incapacitated and should have a guardian over her physical and mental
needs, but not her finances.

BURDEN OF PROOF


 A probate court appoints a guardian according to the circumstances of each
case and considering the best interests of the ward. Tex. Prob. Code Ann. § 677(a)
(Vernon Supp. 2003); Trimble v. Texas Dep't of Protective & Regulatory Servs., 981
S.W.2d 211, 215 (Tex. App.--Houston [14th Dist.] 1998, no pet.). Before appointing
a guardian, the court must find by clear and convincing evidence that:

 (1) the proposed ward is an incapacitated person;


 (2) it is in the best interest of the proposed ward to have the court
appoint a person as guardian of the proposed ward; and


 (3) the rights of the proposed ward or the proposed ward's property will
be protected by the appointment of a guardian.


Tex. Prob. Code Ann. § 684(a) (Vernon Supp. 2003). An incapacitated person is:

 an adult individual who, because of a physical or mental condition, is
substantially unable to provide food, clothing, or shelter for himself or
herself, to care for the individual's own physical health, or to manage
the individual's own financial affairs . . . .


Id. § 601(14)(B). The court must also find by a "preponderance of the evidence" that:

 (1) the court has venue of the case:


 (2) the person to be appointed guardian is eligible to act as guardian and
is entitled to appointment, or, if no eligible person entitled to
appointment applies, the person appointed is a proper person to act as
guardian;


 (3) if the guardian is appointed for a minor . . . ; and


 (4) the proposed ward is totally without capacity as provided by this
code to care for himself or herself and to manage the individual's
property, or the proposed ward lacks the capacity to do some, but not all,
of the tasks necessary to care for himself or herself or to manage the
individual's property.


Id. § 684(b). Further, 

 [t]he court may not grant an application to create a guardianship unless
the applicant proves each element required by this code. A
determination of incapacity of an adult proposed ward . . . must be
evidenced by recurring acts or occurrences within the preceding six-month period and not by isolated instances of negligence or bad
judgment.


Id. § 684(c).


 In the probate court's amended order appointing a guardian of the person, the
court stated it found by "clear and convincing evidence" that: (1) Hinrichsen is an
incapacitated person; (2) it is in Hinrichsen's best interest to have the court appoint
a guardian; and (3) Hinrichsen's personal rights will be protected by the appointment
of a guardian. The court's appointment order further stated the court found by a
"preponderance of the evidence" that: (1) it had venue; (2) no eligible person with a
superior right to be appointed guardian has applied for guardianship and the Harris
County Guardianship Program, although unrelated, is a proper person to act as
guardian; and (3) Hinrichsen is partially without capacity for self-care.

STANDARD OF REVIEW


 In her single issue, Hinrichsen asserts the probate court erred in finding that the
evidence presented at the hearing rose to the level of clear and convincing evidence
necessary to create a guardianship over her. Hinrichsen challenges the legal and
factual sufficiency of the evidence to support the probate court's findings.

 "Clear and convincing evidence" means the measure or degree of proof that
will produce in the mind of the trier of fact a firm belief or conviction as to the truth
of the allegations sought to be established. In re J.F.C., 46 Tex. Sup. Ct. J. 328, 332
(Dec. 31, 2002); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). In conducting a legal
sufficiency review, a court should look at all the evidence in the light most favorable
to the finding to determine whether a reasonable trier of fact could have formed a firm
belief or conviction that its finding was true. In re J.F.C., 46 Tex. Sup. Ct. J. at 333. 
Looking at the evidence in the light most favorable to the finding means that a
reviewing court must assume that the fact finder resolved disputed facts in favor of
its finding if a reasonable fact finder could do so, and that it should disregard all
contrary evidence that a reasonable fact finder could have disbelieved or found to
have been incredible. Id. at 333-34. If, after conducting its legal sufficiency review,
a court determines that no reasonable fact finder could form a firm belief or
conviction that the matter that must be proven is true, then that court must conclude
that the evidence is legally insufficient. Id. at 334.

 In a factual sufficiency review, a court of appeals must give due consideration
to evidence that the fact finder could reasonably have found to be clear and
convincing. Id. We should consider whether disputed evidence is such that a
reasonable factfinder could not have resolved that disputed evidence in favor of its
finding. Id. If, in light of the entire record, the disputed evidence that a reasonable
fact finder could not have credited in favor of the finding is so significant that a fact
finder could not reasonably have formed a firm belief or conviction, then the evidence
is factually insufficient. Id. A court of appeals should detail in its opinion why it has
concluded that a reasonable fact finder could not have credited disputed evidence in
favor of the finding. Id.

 DISCUSSION


 On appeal, Hinrichsen argues that the following evidence, or lack of evidence,
requires a reversal in this case:


 Evidence that Hinrichsen was substantially able to care for herself before
the May 1, 2001 hearing, and she does not want to be under a guardianship.



 

 The lack of evidence showing that "recurring acts or occurrences within the
six-month period" preceding the May 1, 2001 hearing established the need
to create a guardian of the person, as required by section 684(c) of the
Probate Code. Tex. Prob. Code Ann. § 684(c) (Vernon Supp. 2003).



 Hinrichsen cites, in support of her arguments, the portion of the evidence
summarized above indicating she was substantially able to care for herself, i.e., she
was able to provide food, clothing, and shelter for herself, and to care for her own
physical health and to manage her own financial affairs. Thus, Hinrichsen argues the
State failed to prove by clear and convincing evidence that she was an "incapacitated
person" as defined by Probate Code section 601(14)(B).

 As a reviewing court, we must consider the entire record, which includes the
following evidence of recurring acts or occurrences during the six-month period
between November 1, 2000 and May 1, 2001:


 From November 8, 2000 through December 18, 2000, Hinrichsen was
living at the Harris County Psychiatric Center; she was suffering from
schizophrenia and paranoia; she continuously refused to take an anti-psychotic drug her doctor wanted her to take.



 

 From December 18, 2000 to January 25, 2001, Hinrichsen was admitted for
treatment at Rusk State Hospital.

 After her discharge from Rusk State Hospital, Hinrichsen again refused to
take her medication. According to the testimony of Dr. Coppersmith,
Hinrichsen was suffering from paranoid schizophrenia, and her symptoms
were severe when she was not taking her medication. At the May 1
hearing, Dr. Coppersmith testified Hinrichsen had not taken her medication
since February 2001. He further testified that she would deteriorate and end
up in the hospital again if she did not take her medicine regularly.



 The trial court also heard the following evidence:


 Hinrichsen had been in and out of psychiatric hospitals for the past 15
years, and when she was not medication-compliant her symptoms would
become so severe that she needed to be institutionalized.



 

 Hinrichsen had previously been under full guardianship by the Harris
County Guardianship Program for two years, from 1994 to 1996, and
during that time she maintained a constant level of medication, her
condition stabilized, and her health improved. During that time, Harris
County provided regular transportation to Hinrichsen so she could get her
medication. In 1996, Dr. Coppersmith wrote the court giving his opinion
that Hinrichsen was no longer incapacitated because she had been stable
long enough that she would continue to take her medication. The
guardianship was removed at that time. However, Hinrichsen ceased taking
her medication, ran away to Alabama, and became destitute to the point of
living out of garbage cans. Hinrichsen was again hospitalized in February
1999.



 The trial judge further had the benefit of observing Hinrichsen in court during
the May 1 hearing. Her often-bizarre testimony is summarized above. 

 It is true that there was testimony that in the past month or two Hinrichsen had
been able to do her laundry and take care of her home and herself. However, the
overwhelming evidence indicated that Hinrichsen's mental health had declined as a
result of her failure to take the medication she needed and that, because of her mental
condition, she was substantially unable to care for her own physical health, which
depended on the needed medication.

 Looking at all the evidence in the light most favorable to the trial court's
findings, we conclude that a reasonable trier of fact could have formed a firm belief
or conviction that Hinrichsen was an incapacitated person and that it was in her best
interest to have the court appoint a guardian for her to protect her rights. Therefore,
we hold that the evidence is legally sufficient to support the trial court's findings.

 Further, giving due consideration to the evidence that the trial court could
reasonably have found to be clear and convincing, we hold the evidence is factually
sufficient to support the trial court's findings.

 Accordingly, we overrule Hinrichsen's single issue.

CONCLUSION

 We affirm the trial court's order appointing the Harris County Guardianship
Program guardian of the person of Hinrichsen.



 

 Margaret Garner Mirabal (4)

 Justice


Panel consists of Justices Taft, Mirabal, and Smith. (5)
1. The Harris County Guardianship Program is a publicly funded program
operated by the Harris County Community Development Department. The Program
provides guardianship and related services primarily to indigent adults who are
determined by the probate courts to be incapacitated. Harris County Community
Development Department web site at http://www.hchcda.co.harris.tx.us/division/

gaurdian/index.html (last visited Jan. 31, 2003).
2. The University of Texas Harris County Psychiatric Center is an acute care
public psychiatric hospital. University of Texas Harris County Psychiatric Center
web site at http://hcpc.uth.tmc.edu/index.htm (last visited Jan. 31, 2003).
3. Rusk State Hospital is one of nine state hospitals under the auspices of the
Texas Board of Mental Health and Mental Retardation. Rusk State Hospital serves
as a safety net for the community by providing essential psychiatric treatment and
stabilization of persons with severe mental illness. Texas Department of Mental
Health and Mental Retardation web site at http://www.mhmr.state.tx.us/Hospitals/

RuskSH/Welcome.html (last updated Jan. 28, 2003).

4. Former Justice, Court of Appeals, First District of Texas at Houston,
participating by assignment.
5. The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First
District of Texas at Houston, participating by assignment.