

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-08-070-CV

IN THE MATTER OF THE
GUARDIANSHIP OF
BEULAH BOATSMAN,
AN INCAPACITATED PERSON

------------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

------------

## OPINION

------------

This is an appeal from an order appointing a guardian of the person for appellant, Beulah Boatsman. In three issues, appellant challenges the legal and factual sufficiency of the trial court's finding that she is incapacitated, the trial court's refusal to approve a pretrial compromise and settlement agreement, and the trial court's refusal to create a limited guardianship. We affirm.

**Background Facts**

In April 2007, Marlene Henderson, a caseworker for Texas Adult Protective Services (APS), visited appellant's home to investigate an allegation that appellant was being physically neglected due to unsanitary conditions in her home.[1] Appellant, a widow, lived with her son and approximately twelve dogs and cats.

Henderson found appellant's home to be unclean and unsanitary, with an "overpowering" smell and many animals inside. Accordingly, APS arranged for appellant to receive in home health care services from a private agency. However, the agency had to terminate the services because of the dogs in the home. Appellant turned down an offer by APS to find a place for appellant at an assisted living facility. APS also tried to provide adult day care for appellant, but she lived outside town, and transportation was not available.

From April 2007 to the time of trial in January 2008, Henderson visited appellant's home on a monthly basis. Normally, appellant was oriented as to time and place. More than once, Henderson saw animal feces in the living

---

[1] Henderson testified at trial that since 2002, APS had validated ten cases involving appellant; those cases included physical neglect, physical abuse, mental health neglect, emotional and verbal abuse, medical neglect, and exploitation. APS had started a guardianship proceeding previously, while appellant and her son were living in Amarillo, but the proceeding was never completed because appellant and her son moved to Wichita County.

room and kitchen, and twice she smelled "overpowering" cat urine in appellant's bedroom. Additionally, Henderson thought appellant's son was intoxicated and "very manic" during one of the visits. She tried to talk to appellant alone during that visit, but appellant's son "would burst through the door" and was "kind of frightening." During some of her other visits, Henderson smelled alcohol on appellant's son.

In September 2007, Wichita County Sheriff's Deputy Derrald Choate responded to a call from an ambulance service for help with an intoxicated person at appellant's residence. According to Deputy Choate, the ambulance service had "had prior experience out there." Appellant told Deputy Choate that she and her son had been arguing and that she was afraid her son would someday get drunk and kill her. Appellant seemed oriented as to time and place, but she also told Deputy Choate that she had not eaten for two days.

Deputy Choate spoke to appellant's son and thought he was intoxicated.[2] Although he did not make any threats against appellant, he did tell Deputy Choate that he wanted appellant out of the home that day. Although, according to Deputy Choate, appellant did not want to leave her house, the

---

[2] The call came in around 2:00 p.m. One of the pictures of the house that day shows an almost empty approximately forty ounce bottle of beer on a table.

3

ambulance service took appellant to the hospital for examination, and she did not return home until October 11, 2007.

Deputy Choate described the condition of the house as "terrible." He saw dog feces on the couch, floor, and "all over" the kitchen. He also smelled a very strong odor of feces and urine. Deputy Choate took photos of the condition of the house that corroborate his testimony.

Dr. Henry Sanchez-Leal, a psychiatrist, examined appellant for about thirty to forty-five minutes on September 13, 2007 to determine if she needed to be admitted to Red River Hospital for her mental condition. He continued to observe her daily for about ten to fifteen minutes during the month that she stayed at the hospital. Dr. Sanchez-Leal diagnosed appellant has having severe Alzheimer's dementia with delusions. At trial, Dr. Sanchez-Leal testified that this condition affects a person's ability to initiate and stop actions and to anticipate consequences and that a gradual deterioration occurs if left untreated. He prescribed medication for appellant, but he also said that medication will only slow the progress of the disease. Dr. Sanchez-Leal agreed that appellant's mental or physical conditions made her substantially unable to provide herself with food, clothing, or shelter; to care for her own medical needs; or to manage her own finances. However, he also agreed that appellant was discharged to her home because it was safe to release her.

4

On October 30, 2007, Debra King, a guardianship specialist for the Texas Department of Aging and Disability Services, assessed appellant to determine if she was a candidate for guardianship. Appellant was able to give King her name, birth date, and the season,[3] but she was unable to tell King what year it was. She was also unable to do any abstract thinking. Appellant's long-term memory appeared to be intact, but she could not answer specific questions about cooking or personal safety issues. When King asked appellant about safe cooking procedures, appellant answered that she did not cook anymore. Similarly, when King asked her about fire and personal safety, appellant answered, "[M]y memory is gone." She could not answer King's questions about what to do in case of a fire, and she did not know what physical or mental abuse or neglect was.

Appellant was dirty and her hands were filthy and black all over, especially under her fingernails. King noticed that the house still smelled "terribl[y]" of animals, feces, and urine and that there were dogs all over the furniture. Additionally, appellant's son appeared to be intoxicated. He refused to allow King access to any part of the home other than the living room.

---

[3] Appellant knew it was almost Halloween.

As a result of King's assessment and Dr. Sanchez-Leal's examination, on November 30, 2007, the Department of Aging and Disability Services filed an application for appointment of a guardian of the person for appellant. In it, the Department alleged that appellant is incapacitated and unable to provide for her own food, clothing, or shelter or to manage her own physical health or financial affairs.

The trial court conducted a bench trial on January 18, 2008. After Dr. Sanchez-Leal testified for the Department, the parties presented a proposed agreement to the trial court for approval. The proposed agreement provided that (1) the Department would become appellant's guardian of the person, (2) appellant would be initially placed in her home, where she would remain if the house stayed clean, (3) the Department could remove appellant if it determined, in its discretion, that the house was not clean, (4) appellant could not refuse or interfere with any services provided by the Department, nor could her son interfere with such services, and (5) the Department would provide a one-time cleaning of the house to establish the condition in which the house would need to remain. The trial court refused to approve the agreement, and trial proceeded. Appellant did not object to the trial court's refusal to approve the settlement at that time.

6

Appellant was ninety-two years old when she testified at trial. She said that her son prepared all her meals and was "very good." According to appellant, her son helps her "with anything," including getting dressed and taking her medicine. Appellant did not know what medicines she takes, only that there are seven of them. Appellant testified that she receives social security benefits of approximately $900 per month and that she and her son put their checks together to pay expenses. Her son pays all the bills.

Appellant also testified that her memory is not good. She denied ever having been at home when APS visited and did not remember there being any concerns about it being dirty. According to appellant, it is not hard to keep the house clean even with all the animals because her son gets up at 6:00 a.m. every morning and cleans the house. Appellant did not know how many dogs she had, but she insisted that her house was clean.

According to appellant, her son has taken very good care of her. She testified that she wanted to stay at home because she did not want to be separated from her dog and cat. When asked if she were willing to work with the State if she could stay home, appellant stated, "I'm not a mean person. I'm a good person. They're trying to make me mean, I think."

Appellant's son James Ronald Boatsman, Ronnie, testified that he was sixty-six years old and retired; he had lived with his mother for the past twelve

7

years off and on and for the past eight years continuously. According to Ronnie, appellant was capable of feeding herself, but she could not prepare her own meals. He said he prepared at least two meals a day for her; he prepared three when Meals on Wheels did not deliver her a dinner. Appellant was well fed and not emaciated. According to Ronnie, appellant only needs help getting dressed sometimes; however, someone from Falls Home Health was coming to the house twice a week to bathe her. He said that appellant can go to the bathroom; he admitted that she had been a little incontinent in the past, but the doctor changed her medication, and she no longer had a problem with that. Ronnie testified that he mostly provided "visual assistance" to his mother; he was afraid that she might fall down and break her hip.

Ronnie said that the checking account they used was in appellant's name only. He deposited her checks into the account and mailed all the bills, but he had his mother sign everything. According to Ronnie, having her sign things keeps her mind active. Ronnie denied that appellant had a bad memory. He said appellant read the newspaper every day and knew who the President was; he described her memory as "excellent."

Ronnie admitted that Amarillo APS had investigated appellant's home circumstances when they lived in Amarillo. He also admitted that the investigator had found a dead cat and dog in that home although he explained

8

that they had only recently died and he was waiting to bury them. Ronnie denied that there was ever urine or feces in the home in Wichita County, but he admitted that with twelve dogs and cats, "there are accidents." Ronnie said that the dogs and cats were like appellant's children and that she was "panic-stricken" at the thought of going to a nursing home.

Ronnie admitted to having a misdemeanor DWI conviction between one and four years before trial; he was not sure exactly when it had occurred. He also admitted to drinking beer but said he drinks only one quart per day and never more. He said sometimes appellant drinks a couple of cups of his beer.

Appellant was hard of hearing and had gotten hearing aids two days before trial. She did not have them at court the day of trial; Ronnie explained that they had forgotten them.

After the trial ended, the trial court stated on the record,

> Court finds at this time [appellant] does suffer from dementia, Alzheimer's, severe; that she is also indigent. And the Court will grant full guardianship over her, finding that she is incapacitated, and she is in need of a guardianship over her person.

> Court finds she's a victim of neglect. Court finds that the present residence that she resides in is not acceptable for human habitation; that it's a dog kennel. And the Court will not allow her to return there.

> She needs to be placed outside of that filthy, reprehensible environment and placed where she can be properly cared for. . . .

9

Accordingly, on January 28, 2008, the trial court signed an order finding that appellant is incapacitated under section 601 of the probate code and appointing the Department as guardian of the person for appellant. Appellant timely filed a motion for new trial, which the trial court denied.

**Sufficiency of Evidence of Incapacity**

In her first issue, appellant contends that the evidence is legally and factually insufficient to prove that she is incapacitated under sections 601 and 684 of the probate code, a fact which must be proven by clear and convincing evidence. TEX. PROB. CODE ANN. §§ 601, 684(a)(1) (Vernon 2003 and Vernon Supp. 2008).

**Standards of Review**

In a trial to the court in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex. 1996). When a reporter's record is filed, however, these implied findings are not conclusive, and an appellant may challenge them by raising both legal and factual sufficiency of the evidence issues. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When such issues are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Roberson v. Robinson*, 768

S.W.2d 280, 281 (Tex. 1989). The judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. CIV. PRAC. & REM. CODE ANN § 41.001(2) (Vernon Supp. 2007); TEX. FAM. CODE ANN. § 101.007 (Vernon 2002); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

In reviewing the evidence for legal sufficiency, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that its finding was true. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004). We must review all the evidence in the light most favorable to the finding. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d

11

at 627. This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must consider, however, undisputed evidence even if it is contrary to the finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *Hall*, 168 S.W.3d at 170. That is, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *Wilson*, 168 S.W.3d at 827.

In reviewing the evidence for factual sufficiency, we must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that its finding was true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We must not supplant the trial court's judgment with our own. *Id.*; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

12

The jury is the sole judge of the credibility of witnesses and the weight to be given their testimony. *H.R.M.*, 209 S.W.3d at 108, *Golden Eagle*, 116 S.W.3d at 761. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *Golden Eagle*, 116 S.W.3d at 761; *J.F.C.*, 96 S.W.3d at 266-67.

**Applicable Law**

A probate court appoints a guardian according to the circumstances of each case and considering the best interests of the ward. TEX. PROB. CODE ANN. § 677(a) (Vernon 2003); *In re Guardianship of Hinrichsen*, 99 S.W.3d 773, 780 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Before appointing a guardian, the court must find by clear and convincing evidence that the proposed ward is incapacitated, that it is in the proposed ward's best interest to appoint a guardian of the proposed ward, and that the rights of the proposed ward or the proposed ward's property will be protected by the appointment of a guardian. TEX. PROB. CODE ANN. § 684(a); *Guardianship of Hinrichsen*, 99 S.W.3d at 780. An incapacitated person is defined as "an adult individual who, because of a physical or mental condition, is substantially unable to provide food, clothing, or shelter for himself or herself, to care for the individual's own physical health, or to manage the individual's own financial affairs." TEX. PROB. CODE ANN. §

13

601(14)(B); *Guardianship of Hinrichsen*, 99 S.W.3d at 780.  The court must also find by a preponderance of the evidence that the proposed ward is totally without capacity as provided by the code to care for himself or herself and to manage his or her property, or the proposed ward lacks the capacity to do some, but not all, of the tasks necessary to care for himself or herself or to manage his or her property.  TEX. PROB. CODE ANN. § 684(b)(4); *Guardianship of Hinrichsen*, 99 S.W.3d at 780.  Further, "[a] determination of incapacity of an adult proposed ward . . . must be evidenced by recurring acts or occurrences within the preceding six-month period and not by isolated instances of negligence or bad judgment."  TEX. PROB. CODE ANN. § 684(c); *Guardianship of Hinrichsen*, 99 S.W.3d at 780.

**Analysis**

Here, the evidence showed that appellant suffered from a mental or physical condition of a type that causes the loss of cognitive function: Alzheimer's dementia.  Appellant testified that her memory is not good.  In addition, the doctor who diagnosed appellant after having observed her daily for a month while she was in the hospital opined that appellant is unable to substantially provide for her own food, clothing, or shelter, to make her own medical decisions, or to manage her own finances.  Appellant testified that she is unable to prepare her own food and that she is totally dependent on her son

14

or Meals on Wheels to prepare meals for her. However, the evidence also showed that appellant told someone at least once that she had not eaten for two days; thus, there is evidence that if appellant's son failed to feed her on the days she did not receive Meals on Wheels, she would have no way of feeding herself. Appellant could not manage her multiple medications on her own.

Additionally, the evidence showed that appellant was not able to take care of her surroundings even with the help of her son. She lived in a house with twelve dogs and cats, and several people had observed animal feces on the furniture and on the floor as well as smelled the strong odor of pet urine in the house. King testified at trial that the odor from cat urine can pose a health risk. Appellant was dirty when King came to the house to assess her potential need for a guardian. Thus, there is evidence that appellant's son, upon whom she was almost totally dependent for almost all of her needs, consistently failed to maintain clean and sanitary shelter for appellant and that she could not do so on her own.

Although appellant was oriented in time and place when she was examined and at the time of trial, the evidence also shows that she was nevertheless unable to perform the functions needed to provide for herself appropriately. When King asked appellant what one thing she would like to

15

change about her environment, appellant said "every damn thing" and that she had never lived that way in her life.

We conclude and hold that the evidence presented at trial was both legally and factually sufficient to prove by clear and convincing evidence that appellant was incapacitated under the definition in section 601 of the probate code. *See Guardianship of Hinrichsen*, 99 S.W.3d at 782–83. We overrule appellant's first issue.

### Settlement Agreement

In her second issue, appellant contends that the trial court abused its discretion by refusing to approve the settlement agreement proposed by the parties at trial.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. TEX. R. APP. P. 33.1(a); *see also* TEX. R. EVID. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The objecting party must get a ruling from the trial court. This ruling can be either express or implied. *Frazier v. Yu,* 987 S.W.2d 607, 610 (Tex.

16

App.—Fort Worth 1999, pet. denied). If trial judge refuses to rule, an objection to the refusal to rule is sufficient to preserve error. TEX. R. APP. P. 33.1(a)(2).

Appellant failed to timely object at trial to the trial court's refusal to approve the settlement agreement. She had ample opportunity to raise the issue at trial, yet she failed to do so until her motion for new trial. Accordingly, she failed to preserve this issue for our review. *See* TEX. R. APP. P. 33.1(a); *Bushell*, 803 S.W.2d at 712.

Moreover, appellant does not challenge the trial court's finding that a guardianship is in her best interest, and the evidence supports such a finding. It also supports a conclusion by the trial court that appellant would be endangered by living at home with a son who drinks—and of whom the evidence shows she was afraid on at least one occasion—even if he were somehow able to maintain an acceptable level of cleanliness in the home. Accordingly, we cannot say that the trial court's refusal to approve the settlement agreement was an abuse of discretion.[4] *See Eddins v. Estate of Sievers*, 789 S.W.2d 706, 707 (Tex. App.—Austin 1990, no writ) (holding that

---

[4] As support for her contention, appellant cites *Stringfellow v. Early*, 15 Tex. Civ. App. 597, 40 S.W. 871 (1897), for the proposition that the law favors the settlement of disputes. Although we agree with this proposition generally, appellant cites no authority requiring the trial court to accept a proposed settlement agreement in a guardianship proceeding.

trial court is vested with broad discretion in determining best interest of a ward). We overrule appellant's second issue.

## Refusal to Create Limited Guardianship

In her final issue, appellant challenges the trial court's refusal to create a limited guardianship. As in her second issue, appellant contends that keeping appellant in her home is a less restrictive alternative to appointing the Department guardian of her person.

Probate code section 602 provides that

> [a] court may appoint . . . a guardian limited authority over an incapacitated person as indicated by the incapacitated person's actual mental or physical limitations and only as necessary to promote and protect the well-being of the person. . . . In creating a guardianship that gives a guardian limited power or authority over an incapacitated person, the court shall design the guardianship to encourage the development or maintenance of maximum self-reliance and independence in the incapacitated person.

TEX. PROB. CODE ANN. § 602 (Vernon 2003). A trial court has broad discretion in deciding the type of guardianship and identity of the guardian. *Eddins*, 789 S.W.2d at 707.

Here, there is sufficient evidence to support the trial court's decision that a permanent guardianship with full authority over the person is in appellant's best interest. All of the services that APS tried to arrange for appellant failed, and despite numerous visits to appellant's home, the conditions remained the

18

same. Eventually, appellant was hospitalized for a month. The evidence showed that appellant was dependent on her son and that he appeared to be intoxicated regularly. As the trier of fact, the trial court was in the best position to observe the credibility and demeanor of the witnesses and determine that appellant's living conditions would not have improved if she were allowed to remain at home under a limited guardianship. *See Golden Eagle Archery*, 116 S.W.3d at 761. Thus, we conclude and hold that the trial court did not abuse its discretion by refusing to create a limited guardianship under probate code section 602. *See Eddins*, 789 S.W.2d at 707. We overrule appellant's third issue.

### Conclusion

Having overruled appellant's three issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: LIVINGSTON, GARDNER, and WALKER, JJ.

DELIVERED: August 21, 2008

19