

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-16-00107-CR

_____

JEFFREY MARTIN REID, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2015F00177

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Jeffrey Martin Reid, an intellectually disabled man with an IQ in the low-to-mid 60s, was described by his brother as an "adolescent in a 38-year-old body." In late 2014, Reid was involved in an incident in Cass County in which the pants of both six-year-old C.C.[1] and Reid were lowered in the immediate presence of each other, resulting in Reid's prosecution for indecency with a child by exposure.

Before trial, in response to motions by both Reid and the State, the trial court entered an order that Reid be examined by Mitchell H. Dunn, M.D., to determine Reid's competency to stand trial and—if Dunn found Reid competent to stand trial—to determine his sanity at the time of the offense. In response, Dunn issued two reports dated August 4, 2015, one concluding that Reid was competent to stand trial and the other determining that Reid was sane at the time of the offense. After the Cass County jury returned a guilty verdict, in a judgment dated June 6, 2016, the trial court assessed punishment at ten years' confinement.

On appeal, Reid asserts that the trial court erred in not conducting a formal trial regarding Reid's competency to stand trial and in excluding evidence of a fifteen-year-old guardianship and that the evidence is insufficient to support the guilty verdict and its implied finding that Reid was sane at the time of the offense.

We affirm the judgment of the trial court because (1) the trial court was within its discretion in concluding that a competency trial was not required, (2) the trial court was within its discretion

---

[1]To protect the privacy of the minor child, we will refer to the minor child by her initials and to any of her family members by pseudonyms. *See* TEX. R. APP. P. 9.8(b)(2).

in excluding evidence of Reid's guardianship, and (3) sufficient evidence supported the implied finding that Reid was sane at the time of the offense.

*(1)     The Trial Court Was Within its Discretion in Concluding that a Competency Trial Was not Required*

Reid asserts that the trial court abused its discretion by failing to conduct a formal trial regarding Reid's competency to stand trial.

A criminal defendant who does not possess the mental capacity to understand the proceedings, to consult with an attorney, and to meaningfully engage with the attorney in the proceedings is incompetent to stand trial. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Mental illness, in and of itself, does not dictate a finding of incompetence. *Turner v. State*, 422 S.W.3d 676, 691 (Tex. Crim. App. 2013); *Moore v. State*, 999 S.W.2d 385, 395 (Tex. Crim. App. 1999). Nor does low intelligence necessarily indicate incompetence to stand trial. *Petetan v. State*, No. AP-77,038, 2017 WL 915530, at *30–32 (Tex. Crim. App. Mar. 8, 2017); *Alvarez v. State*, 480 S.W.2d 646, 647 (Tex. Crim. App. 1972). But a defendant is incompetent when his or her mental illness is such that it prevents him or her from having (a) the sufficient present ability to consult with a lawyer with a reasonable degree of rational understanding or (b) a rational and factual understanding of the proceedings. *Dusky v. United States*, 362 U.S. 402 (1960); *Turner v. State*, 422 S.W.3d at 691; *see* TEX. CODE CRIM. PROC. ANN. art. 46B.003(a) (West 2006).

If there is "some evidence from any source" that the defendant is incompetent to stand trial, a formal competency trial is required. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.004(c) (West Supp. 2016). We examine the contents of this record to determine if it contains any evidence that Reid was incompetent to be tried.

3

In his report dated August 4, 2015, Dunn opined that Reid was competent to stand trial. Dunn based his opinion on (1) a July 28, 2015, interview he conducted with Reid lasting approximately one hour and forty minutes, (2) a July 29, 2015, telephonic interview he conducted with Reid's mother, Janice, lasting twenty minutes, and (3) Reid's indictment, offense narrative, and supplemental narrative from the Cass County District Attorney's Office.

In Dunn's interview with Reid, Reid claimed to have been diagnosed as bipolar with schizophrenia, which he described as getting mad sometimes. Reid denied symptoms of mania. Though Reid claimed to have heard voices, Dunn concluded, based on his interview, that Reid was not having auditory hallucinations, but that he referred to his thoughts as the "voices" he heard. Reid has had a mental retardation diagnosis from a young age and has consistently been in special education classes in school.

In Dunn's interview with Reid's mother, she reported that Reid had been hospitalized three or four times as a result of threatening to kill himself—though Reid never actually attempted suicide. According to Reid's mother, with his IQ scores in the low 60s, Reid had been in special education classes throughout school. When questioned on Reid's history of mood instability and psychosis, she suggested that they were temporary. His moods can change quickly, she noted, but do not last for weeks on end. She denied auditory hallucinations or any grandiose delusional beliefs. When excited, she said, Reid hits himself in the head or hits his head against a wall.

Reid reportedly is on Haldol (5 mg, twice daily), lithium carbonate extended release (450 mg, twice daily), Depakote (500 mg, three times per day), Seroquel (300 mg, three times daily),

4

synthroid, (0.025 mg, once daily), and Haldol Decanoate (in unknown dosage, every twenty-eight days).

Dunn did not discover in Reid any grandiose or paranoid delusions or hallucinations. It did not appear to Dunn that Reid was responding to what he termed "internal stimuli." Dunn got no suggestion from Reid that he thought to harm himself or others. By Dunn's assessment, Reid was aware of day and date, and his memory appeared to work satisfactorily. Dunn concluded that Reid was aware of key facts regarding the world around him. Dunn noted nothing suggesting that Reid had a psychotic illness, a major mood disorder, or an anxiety disorder. Dunn opined that Reid's treatments and medications appear to be directed at controlling Reid's poor frustration tolerance and inappropriate behaviors.

Though Dunn did not test Reid's IQ independently, he opined that, if it is in the low 60s as reported, that constitutes mild intellectual disability. Dunn reports that Reid understands the charges against him and their consequences and was able to describe events surrounding the offense. Dunn stated that Reid understood the pleas available to him and the adversarial nature of his criminal case. Dunn found that Reid responds in an organized and coherent fashion. Dunn opines that the medications he is on do not appear to be hurting his appearance, behavior, or demeanor.

Dunn concluded that Reid does not suffer from mental illness but does suffer from mild mental retardation, also termed mild intellectual disability. In the end, Dunn opined that Reid was competent to stand trial.

5

Through six pre-trial court appearances, Reid seemed to respond appropriately to questions from the bench. At the pre-trial setting of August 17, 2015, Reid also responded appropriately, and, in light of Dunn's reports opining that Reid was competent to stand trial and was sane at the time of the offense, both the State's and Reid's attorneys indicated that this case should proceed normally—that is, neither asked that a competency trial be held. The trial court found Reid competent to stand trial and sane.

Because we identify no evidence in this record that Reid was incompetent to stand trial, we conclude that the trial court acted within its discretion in proceeding with trial on the merits without a competency trial. *See Valdes-Fuerte v. State*, 892 S.W.2d 103, 106–07 (Tex. App.—San Antonio 1994, no pet.)

*(2)*     *The Trial Court Was Within its Discretion in Excluding Evidence of Reid's Guardianship*

Reid claims that the trial court abused its discretion when it excluded evidence of Reid's guardianship. At trial, Reid sought to have admitted into evidence official court records of a guardianship that was set up for him in 2005 and had been continuously in existence through trial. On the State's objection that the records were not relevant to Reid's insanity defense and that they would confuse the jury, the records were excluded. While Reid was given an opportunity to make a formal offer of proof, he made no such offer. The State claims that, therefore, this issue has not been preserved for our review. We conclude that it was preserved, to an extent.

In Reid's argument to have the evidence admitted, he offered the following:

> Your Honor, Ms. O'Rand, of course, is just a custodian of the records and we're offering them to show that there was a guardianship established in 2005, and it's remained current through today. And[,] Your Honor, as to the objection, all of these terms of guardianship, civil commitment, competency[,] and insanity . . .

6

overlap. There [are] issues in each one of these proceedings that overlap each other, and I can go through each of the elements of the guardianship, civil commitment[,] and competency and insanity, but we believe that it is relevant that he was adjudged in need of a guardian and has continued to be adjudged in need of [a] guardian in that he lacks the capacity to perform tasks to take care of himself and/or manage his property.

In lieu of a formal offer of proof, we understand this as Reid's offer that the guardianship records would show that Reid's guardianship was established because he needed help taking care of himself and managing his property.[2]

To establish a guardianship, a court must find that the proposed ward is "an incapacitated person." TEX. EST. CODE ANN. § 1101.101(a)(1)(A) (West Supp. 2016). Since Reid is an adult, categorizing him an "incapacitated person" required a finding that, "because of a physical or mental condition," Reid is "substantially unable to:  (A) provide food, clothing, or shelter for himself . . . ; (B) care for [his] own physical health; or (C) manage [his] own financial affairs." *See* TEX. EST. CODE ANN. § 1002.017(2) (West 2014); *see also In re Guardianship of Hinrichsen*, 99 S.W.3d 773, 780 (Tex. App.—Houston [1st Dist.] 2003, no pet.). We understand Reid to claim that the guardianship is relevant because it is evidence that, due to his mental disability, he cannot properly care for himself or his property, if any. Any relationship between such a finding needed to establish Reid's guardianship and a finding of Reid's insanity would be tangential and speculative at best.

---

[2]To the extent that Reid intended to show anything beyond this from the guardianship records, he preserved nothing for review. *See Mays v. State*, 285 S.W.3d 884, 891 (Tex. Crim. App. 2009); *Rhoten v. State*, 299 S.W.3d 349, 354 (Tex. App.—Texarkana 2009, no pet.).

To successfully assert the defense of insanity, a criminal defendant must prove "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a) (West 2011). We see no substantial overlap between the proof required for these two findings, in other words, that the guardianship's existence in this case had any relevance to the question of Reid's sanity at the time of the offense. We also see danger that the jury, presented with the guardianship, could become confused in evaluating the sanity issue. Therefore, excluding the guardianship records was within the trial court's discretion because they were, at best, marginally relevant and could have been more prejudicial than probative on the issue of Reid's sanity. *See* TEX. R. EVID. 403.

The trial court's evidentiary ruling is reviewed on appeal for an abuse of discretion, which occurs only if the ruling is outside the zone of reasonable disagreement. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Green v. State*, 934 S.W.2d 92, 104 (Tex. Crim. App. 1996). There was no abuse of discretion here.

We overrule this point of error.

*(3)*   *Sufficient Evidence Supported the Implied Finding that Reid Was Sane at the Time of the Offense*

Reid also argues that the evidence is legally insufficient to support the jury's rejection of his insanity defense. We disagree.

One cannot be convicted of a criminal offense, if, as a result of severe mental disease or defect, he or she did not know the conduct was wrong. *See* TEX. PENAL CODE ANN. § 8.01(a). We examine the evidence in this record that may bear on the issue of whether Reid knew right from wrong at the time of the offense.

William Lawrence, a deputy sheriff with the Cass County Sheriff's Office, testified that, when Reid was initially confronted by Lawrence about the offense, immediately after the offense, he knew what it was about. Lawrence also stated that Reid threatened to kill his parents and himself once Lawrence left the Reid house. During this conversation, Reid appeared to Lawrence to be "somewhat upset, maybe a little angry." In light of Reid's suicide threat, an ambulance was called to get Reid some medical help.

Richard Lewis, who was with the Cass County Sheriff's Office at the time of the offense, joined Lawrence at Reid's house immediately after the offense. Lewis also thought Reid acted angry. Lewis thought that Reid knew why officers entered the residence and became suicidal and homicidal. During the interview, Reid remarked to Lewis that Reid wears women's thong panties and likes men. Reid showed Lewis a photo on his telephone of a nude female. He also told Lewis that he watches pornographic material on his Xbox, that he does not want others to see, suggesting that he knows it is bad material. Lewis reported Reid as appearing coherent and aware of what was going on. On the way to the ambulance, Reid threatened the family that reported him.

Candida Velasquez, the aunt of the child victim, testified that she saw Reid run away from the scene of the offense as he pulled up his pants.

Fabian Vasquez, a minor cousin to the victim, testified that he saw the victim with her shorts and underwear pulled down and Reid standing in her presence. Fabian stated that he clapped his hands behind Reid's head, at which time Reid ran home.

Brodie Sproles, who at the time of the offense was a paramedic for Champion Emergency Medical Service, testified that, in the immediate aftermath of the offense, he was part of a team

9

dispatched to the scene, where they picked Reid up. According to Sproles, Reid was able to give them a good medical history and the medications he was on, was coherent and conversed in a regular fashion, and appeared to be in control of his mental faculties at the time. As the ambulance pulled out, Sproles witnessed Reid focusing on a man—apparently his neighbor whose family had reported the offense—standing near where the offense occurred, toward whom Reid displayed agitation, pointed, and said, "I'll f***ing kill that man." During the ride with Sproles, Reid received a cell phone call. After hanging up on the call, Reid told Sproles, "He's mad at me because I f***ed his daughter." Reid mentioned that this daughter was six or seven years old. Reid recounted to Sproles an explicitly detailed story about an alleged sexual encounter in which the young girl invited Reid to have intercourse with her, which invitation Reid refused. To Sproles, Reid seemed to be proud of that. In Sproles opinion, that was why the man from across the street was mad at him and why Reid was threatening suicide.

The child victim in this case—eight years old at time of trial—testified that the event that interrupted the offense was Fabian coming up behind Reid and tapping him on the shoulder, at which time Reid ran inside his house.

Stephanie Williams, Program Director with Daybreak Community Services, testified at the request of Reid that, shortly before trial, Reid moved into their Miramar home in DeSoto, Texas, which receives payment from Medicaid for clients with IQs of less than 75. Williams reported that Reid's IQ test yielded a 65 IQ. According to Williams, the residents of the Miramar home are "not always" able to know right from wrong or to conform their behavior, that Reid has had some behavioral issues in the home, and that those seem to be behavioral issues, not mental deficiencies.

10

Satish Narayan, a psychiatrist from Plano, Texas, testified at Reid's request that he examined Reid as a result of a civil commitment proceeding. Narayan wrote the report that was admitted as Exhibit 3. Per Narayan's notes from a prior examination of Reid, conducted January 1, 2015, Reid's Depakote level was a relatively toxic 844, potentially affecting his cognitive abilities. Narayan's January 2015 examination of Reid was not conducted for the purpose of determining his sanity at the time of the offense. Narayan's mental status evaluation did note that Reid exhibited distress over the offense in question, in that he stated, "I f***ed her up." Per Narayan, Reid held his head in his hands and expressed some guilt and shame surrounding the event. Narayan admitted that one might think that such behavior indicated Reid knew right from wrong, but noted that such was not the purpose of that evaluation. Narayan's evaluation was done quickly, whereas, if Reid were being evaluated to determine whether there was a diagnosis of a particular mental illness, that would be done over a lengthy period of time.

Reid's mother, Janice, testified that Reid got scared when he saw officers in the Reid home immediately after the offense. He got defensive quickly and threatened to kill himself. According to Janice, for some things, Reid does know right from wrong; he may know something is wrong, but will do it anyway. Janice stated that, if Reid went to the store to buy some sweet rolls, he would know that he needed to pay for them.

Jason Reid, Reid's brother, testified that Reid is about a twelve- or thirteen-year-old child in a thirty-seven-year-old body. Jason stated that Reid sometimes knows right from wrong, but that he does not know what he is saying. Jason agreed that, if Reid were to go to the store to buy something, he would know he needed to pay for it.

11

From the above, there is ample evidence that Reid knew right from wrong at the time of the offense.  The jury had legally sufficient evidence to support its finding that Reid was guilty of the offense.

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice


Date Submitted:     March 16, 2017
Date Decided:       April 21, 2017

Do Not Publish