**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-16-00152-CV**
_____

**IN THE GUARDIANSHIP AND ESTATE OF
DARLENE ANN LAFLEUR HOFFPAUIR**

**On Appeal from the County Court at Law
Orange County, Texas
Trial Cause No. P16978**

**MEMORANDUM OPINION**

Appellant Darlene Ann LaFleur Hoffpauir ("Darlene") asserts that the evidence is factually insufficient to support the jury's findings that Darlene is an incapacitated person; Darlene lacks the capacity to handle business, managerial, and financial affairs; it is in Darlene's best interest for the court to appoint a guardian; and Darlene's property would be protected by such an appointment. Darlene also complains that the trial court abused its discretion by excluding evidence. We affirm the trial court's judgment.

1

Due to the circumstances surrounding this case, we allowed Darlene to file a pro se brief, because Darlene alleged that the trial judge exhibited "extreme bias" against her and colluded with another judge, the head of her trust, her attorneys, and her family to declare her incompetent and deprive her of her money and property. Based on our review of the appellate record, the record does not support Darlene's allegations that the trial court exhibited bias or colluded with the applicants, attorneys, or witnesses. We further note that the record does not support Darlene's allegation that her appellate counsel would not fight for her on appeal, as the record shows her appellate counsel filed a merits brief challenging the factual sufficiency of the evidence and the trial court's exclusion of evidence. The record also shows that Darlene's trial counsel was partially successful in the trial court, because the jury did not find that Darlene needed a guardian of the person. Because the evidence in the record is factually sufficient to support the jury's findings, we conclude that Darlene's pro se issues are without merit and do not warrant a new trial.

BACKGROUND

In September 2014, Michael LaFleur and his sisters, Buffy LaFleur Burliegh and Paula LaFleur ("the LaFleurs"), filed an application for temporary and permanent guardianship of the person and the estate of their mother, Darlene, alleging that Darlene was incapacitated and infirm in such a manner that materially

2

hindered her ability to care for herself and to manage her financial affairs. The LaFleurs alleged that Darlene was vulnerable and that she was being physically and mentally abused, and financially exploited by Tillman Hoffpauir ("Tillman"). According to the LaFleurs, the trial court needed to appoint a guardian to protect Darlene from Tillman, who had isolated Darlene from her family, taken Darlene's money, and recently married Darlene in secret. The LaFleurs alleged that Tillman had refused to let them see or talk to Darlene since the marriage occurred, and that they were concerned for Darlene's physical health and safety. According to the LaFleurs, Darlene received a monthly income of approximately $30,000, and they had reason to believe that Tillman was taking and squandering Darlene's income and seriously damaging and dissipating Darlene's estate.

The LaFleurs filed a motion requesting that the trial court order Darlene to submit to a mental examination, and the trial court ordered Darlene to be examined by Dr. Edward Gripon, a psychiatrist. The LaFleurs also filed a motion asking the trial court to appoint an attorney ad litem to protect Darlene's interests. The trial court, finding it was necessary to appoint an attorney ad litem to represent the best interests of Darlene, appointed Chad Robison as the attorney ad litem.

On September 24, 2014, the trial court conducted a hearing on the LaFleurs' application for temporary guardianship. The trial court considered a letter from

3

Gripon, in which Gripon concluded that Darlene had senile dementia and opined that Darlene did not possess sufficient ability to manage issues involving her person or her financial affairs. After hearing the evidence and arguments of counsel, the trial court found that the LaFleurs had presented substantial evidence showing that Darlene is an incapacitated person and that there was probable cause to believe that Darlene's estate required the immediate appointment of a guardian. The trial appointed Stephen Howard as the temporary guardian of Darlene's estate.

The trial court also found it was necessary to appoint a guardian ad litem to protect Darlene's interests and a court investigator to investigate the circumstances alleged in the LaFleurs' application and to determine whether a less restrictive alternative to a guardianship is appropriate. The trial court appointed Tommy White as both the guardian ad litem and the court investigator. The trial court ordered White to interview Darlene, investigate Darlene's finances and the value of her estate, file a written report concerning the findings of the investigation and the best interest of Darlene, and to facilitate supervised weekly visitations between Darlene and the LaFleurs in accordance with the trial court's order. The trial court further ordered that Darlene undergo a complete neuropsychological assessment conducted by Dr. Donald Trahan for the purpose of determining Darlene's mental capacity.

In February 2016, the LaFleurs' application for permanent guardianship of the person and estate of Darlene was tried before a jury. Robert Cormier, Darlene's brother, testified that he, Darlene, and Darlene's twin sister, Carlene Swenson, are all beneficiaries of a family trust established by their father, and Robert manages the trust with the assistance of accountants and lawyers. Robert testified that in 2011, he bought Darlene's stock in a well servicing business for $1.5 million plus interest, and Robert paid Darlene $100,000 per month for fifteen months. At that time, Robert did not question Darlene's ability to handle her financial affairs. Robert also testified that in 2014, he wanted to buy Darlene's interest in a piece of property, but did not because Darlene's capacity was in question.

Robert testified that prior to the LaFleurs filing the application for guardianship, he noticed that Darlene was having problems managing her money, and Robert suggested that Darlene hire someone to take care of her finances. Robert explained that Darlene complained that she was tired of her children always wanting money, and Robert suggested that Darlene have her son help handle her finances, which Darlene did for a short period. Robert testified that he knew that Darlene liked to deal in cash and was going through a lot of money, and at one point, Darlene needed to borrow money from Robert. Robert explained that he had advised Darlene that she needed to save money.

5

Robert testified that he supports the LaFleurs' application for guardianship, and Robert believes that it is in Darlene's best interest to have a guardianship established. According to Robert, Tillman has isolated Darlene from her family, and Darlene needs someone to help her. Robert explained that in March 2013, Darlene complained that she did not want Tillman's name on a camp that she had purchased in Colmesneil. Robert testified that Tillman said that he would have his name removed from the deed, but Tillman never followed through. According to Robert, it was acceptable for Darlene to give her money to her family, but not to Tillman.

Robert further testified that in October 2014, Darlene asked him to pick her up from the hospital and take her back to the family home in Orangefield. According to Robert, Darlene was frail and sick, and Darlene stated that she wanted to get away from Tillman and the camp. Robert explained that Darlene stayed in Orangefield for approximately two weeks, but then went back to Colmesneil with Tillman.

Michael, Darlene's son and applicant in the guardianship, testified that in 2011, Darlene went from having a normal life to having more money than she was accustomed to. Michael testified that in October 2011, Darlene attended a funeral where she met Tillman. Michael explained that he did not believe that Tillman's intentions were pure, because Tillman was much younger than Darlene and usually dated younger women. According to Michael, Tillman lost his job in November

2011, and has been unemployed since then. Michael explained that in March 2012, Darlene called and told him that she wanted Tillman out of her house, because Tillman had gone through her personal paperwork and inquired about her will. Michael testified that Tillman left, but came back the next month and tried to get Darlene to buy him a vehicle. Michael further testified that in May 2012, Darlene asked him to run Tillman off again, because Tillman was still trying to get Darlene to buy him a vehicle.

Michael explained that in October 2012, Darlene asked him for help in managing her finances, and at that point, Darlene had $700,000 in a checking account that could be accessed with a debit card. Michael helped Darlene open a new account, but by December 2012, Darlene had changed her mind and took back control of her finances because someone had convinced Darlene that Michael had stolen her money. According to Michael, by February 2013, Darlene refused to see any of her family.

Michael testified that he was concerned that if Darlene kept spending money at her current rate, she would run out. According to Michael, from June 2011 to March 2013, Darlene bought homes for his sister Paula, Paula's daughter, Paula's son, and a camp in Colmesneil from Tillman's friend. Michael explained that in December 2013, Tillman did not allow Darlene to see Paula and Paula's son for

Christmas, and they were the family members closest to Darlene. Michael testified that in May 2014, Darlene told his sister, Buffy, that she was having financial problems and needed help with her bills, but Darlene refused Buffy's help after a few weeks. Michael explained that in July 2014, he found Darlene unconscious in her home in Orangefield, and Darlene only stayed in the hospital for two days before she signed herself out against medical advice. According to Michael, it was later in July when he found out that Darlene had married Tillman without telling the family.

Michael testified that in August 2014, Darlene was admitted to the hospital, fired her housekeeper of sixteen years, told Michael that she needed help with her finances, accused Michael of trying to break into her house, and called the police when Michael went to her house to pick her up for a scheduled family meeting. Michael further testified that immediately after the marriage, Darlene gave Tillman power of attorney over her affairs and executed a will leaving her estate to Tillman. Michael explained that he filed the guardianship application in September 2014, because he was concerned for Darlene. According to Michael, Darlene was admitted to the hospital after the guardianship was filed, and Michael and his sister stayed with Darlene when she came back to Orangefield. Michael testified that Darlene was scared and confused, and that she had told Michael that she could not believe that she was so stupid to marry Tillman. Michael further testified that Darlene told him

8

that Tillman was a bully and was never going to quit. According to Michael, Darlene was worried about money she had left in a safe in Colmesneil.

Michael testified that Darlene went to Colmesneil with Tillman in October 2014. Michael explained that despite the trial court ordering Darlene to attend family visitations, Darlene stopped attending. According to Michael, when Darlene did attend family visitations, Tillman "wired" her with a tape recorder. Michael testified that he believed that it was in Darlene's best interest that a guardianship be established for her protection.

Joseph Broussard, an attorney who had performed legal work for the Paul Cormier Trust and for Darlene, testified that in May 2014, he prepared disability documents and a will for Darlene. According to Broussard, he believed that Darlene understood the documents that he prepared. Broussard explained that a few weeks after Darlene executed the documents, Darlene stated that the will did not comport with her interests and intent. According to Broussard, Darlene expressed an interest in changing the will, but never followed through. Broussard explained that he had concerns about Darlene's sudden turn and did not feel comfortable changing the will, because Darlene had discussed at length her intentions of providing her property to her children.

Buffy, Darlene's daughter and applicant in the guardianship, testified that she used to have a close relationship with Darlene, until Darlene became isolated a year or two before the guardianship suit was filed. Buffy testified that after the guardianship was filed, Darlene told Buffy that she was scared of Tillman, because Tillman was a bully and would not stop until he got what he wanted. According to Buffy, she is concerned about Darlene's health and safety, and Buffy testified that it was in Darlene's best interest that a guardianship be established.

The LaFleurs presented the deposition testimony of Paula. Paula testified that Darlene bought her a home in December 2011 and provided a monthly allowance to care for the home. Paula explained that Darlene stopped supporting her financially when the guardianship suit was filed, and that Darlene's sister has been taking care of Paula's necessities. Paula explained that in 2012, Darlene became isolated, and Darlene called Paula several times and asked her to get Tillman out of Darlene's house. Paula testified that in 2013, she and her siblings decided to bring the guardianship application, because they knew something was wrong with Darlene. Paula explained that she dropped out of the guardianship application because her son died.

The LaFleurs also presented the deposition testimony of Darlene. During Darlene's deposition, Darlene testified that she had not seen her grandchildren in

approximately two years, and Darlene could not remember the names and ages of some of her grandchildren. Darlene testified that she did not like her children trying to rule her life. According to Darlene, she had a close relationship with Buffy, until Buffy turned against her. Darlene testified that she no longer had a relationship with Michael, because Michael lied and stole money when Darlene put him on her bank account. The record shows that Darlene was unable to complete her first deposition, which was conducted on January 26, 2016, or a second deposition which was conducted on February 3, 2016, because of complaints of a headache.

Howard, the temporary guardian of Darlene's estate, testified that his duty was to find all of Darlene's assets, account for the assets, pay Darlene's bills, and maintain the status quo during the pendency of the application for guardianship. Howard explained that he created a trust account in which he deposited Darlene's trust income and social security benefits, and Howard filed an initial and final inventory. Howard also explained that he paid all of Darlene's legitimate bills, including legal fees. Howard testified that he provided Darlene with an allowance, and Darlene had filed a pro se pleading requesting that she receive a monthly allowance of $125,000.Howard testified that in October 2014, he met with Darlene to discuss her estate. Howard testified that Darlene's bank records showed a pattern of behavior that was highly disturbing. According to Howard, Darlene received

11

$30,000 per month in trust income, and her bank records showed that on several occasions, Darlene would deposit a small portion, such as $5,000, and "take the rest of it as cash out the door." Howard testified that he was unable to locate the cash that Darlene took from the bank, which Howard initially estimated to be approximately $84,000. Howard explained that Darlene's pattern of withdrawing cash made the money untraceable. Howard testified that the bank's employees told him that Tillman brought Darlene to the bank and waited outside in the car while Darlene conducted her business. According to Howard, when he asked Darlene if Tillman knew anything about the money, Darlene told him that Tillman "was the worst mistake she'd made in her life."

Howard testified that when he asked Darlene about the missing money, Darlene "expressed complete cluelessness of where the money was." Howard testified that Darlene also did not recall writing a $10,000 check to an attorney, and that Darlene indicated that she did not even know the attorney. Howard explained that during his visit with Darlene, she was unable to provide him with any information concerning her financial affairs or help him to determine where her assets were located. Howard testified that he visited all of the banks in the area in an attempt to capture the missing money. According to Howard, when his investigation revealed that the missing money amounted to several million dollars, he decided to

hire Michael Kiefer to conduct a forensic audit over a five-year period. Howard explained that when he met with Darlene a second time, she was still unable to provide any information concerning the missing money.

Howard testified that the forensic audit showed that between $700,000 and $1.3 million dollars was missing from Darlene's accounts. According to Howard, Darlene cannot handle her money, and a permanent guardian of Darlene's estate should be appointed to manage her finances and ensure that Darlene is not "exploited and looted." Howard explained that Darlene's bank records strongly suggest that an unknown person has engaged in a deliberate pattern of fraud to drain the assets of Darlene's estate.

Kiefer, a certified public accountant who is also certified in financial forensics, testified that Howard hired him to examine Darlene's banking information and to help locate missing funds. According to Kiefer, he prepared three reports in Darlene's case. Kiefer explained that he analyzed the outflow of money from Darlene's account and determined that Darlene had used several methods to withdraw cash from her bank account from January of 2011 through September 2014. Kiefer testified that he used three different methodologies in conducting his audit, and that approximately $3.8 million came out of Darlene's account during the applicable time period, with thirty-three percent of that amount, or $1.3 million,

taken out through cash transactions that were untraceable. Kiefer explained that the amount of cash transactions substantially increased from 2011 to 2014, and that there seemed to be a correlation between the time that Tillman entered Darlene's life in 2011, and the increase of missing cash. Kiefer determined that the amount of missing cash from Darlene's account is between $732,280.09 and $1,308,425.84.

White, Darlene's guardian ad litem and the court investigator, testified that his duty was to protect the best interests of Darlene. White explained that as part of his investigation, he met with Darlene and took her to the doctor. White filed an interim report, in which he stated that Darlene had very little recall of events, including the guardianship, her latest hospitalization, and her financial affairs. White reported that Darlene had difficulty with time, including the date and year. According to White, when he questioned Darlene about the large cash transactions that had occurred between July and September 2014, Darlene could not recall any details. White testified Darlene did not recognize the transactions, which totaled $84,000.

White explained that when he took Darlene to her examination with Dr. Trahan, he assisted Darlene with her paperwork. White testified that when he told Darlene that she needed to sign her name as Darlene Hoffpauir, Darlene asked him if she was still married to Tillman. White further testified that Darlene told him that

14

marrying Tillman was a big mistake. According to White, at the time he prepared his interim report, it appeared obvious that Darlene had been exploited and was in need of a permanent guardian of her estate.

In his final report, White stated that four different doctors had diagnosed Darlene with some degree of dementia, and Darlene could not understand with reasonable accuracy the value of her estate. White testified that Darlene's estate has a sustainability problem, and that the evidence showed attempts at less restrictive alternatives to a guardianship of the estate had been made, including multiple attempts at powers of attorney and placing different people on Darlene's bank accounts to help Darlene manage her money, but all of those attempts had failed. According to White, Darlene's estate was vulnerable, and it was in Darlene's best interest that a guardian be appointed to manage and protect her assets.

Gripon, a board certified psychiatrist, testified that the trial court appointed him to conduct a psychiatric competency examination on Darlene. Gripon testified that he examined Darlene in September 2014, and Gripon explained that his examination included a face-to-face interview, a Mini-Mental State Examination ("MMSE"), and a formal mental status examination. In his report, Gripon stated that Darlene was a "relatively poor historian[,]" and that "her immediate memory and recent recall was significantly deficient." Gripon noted in his report that Darlene

was not oriented to time or to recent events, her "fund of general information was essentially nil[,]" and her "social judgment is impaired." Gripon testified that Darlene scored a fourteen on the MMSE, and he explained that a score of thirteen to twenty indicates a moderate level of dementia. Gripon explained that Darlene's score was on the border between moderate and severe.

Gripon testified that when he asked Darlene about her financial matters, she seemed to be "totally oblivious to what was going on." Gripon explained that while Darlene had an accurate knowledge of the amount of money she received monthly, Darlene could not account for where any of the money was spent. According to Gripon, Darlene suffers from moderate dementia. Based on his examination, Gripon diagnosed Darlene with "Senile Dementia of the Alzheimer's Type-moderate state[,]" which is now called neurocognitive disorder, moderate degree. Gripon opined that, based on reasonable psychiatric probability, Darlene is totally incapacitated and does not possess sufficient ability to manage issues involving her person or her finances. Gripon recommended that Darlene undergo a full battery of neuropsychological testing, which he opined, would clearly support the diagnosis of senile dementia.

Trahan, a board certified neuropsychologist, testified that the trial court appointed him to conduct a full neuropsychological examination on Darlene for the

16

purpose of evaluating her capacity. Trahan explained that the examination, which usually takes about seven hours, includes interviews with the patient and family members, a record review, and approximately fifteen different test procedures. Trahan interviewed Darlene, conducted a comprehensive neurobehavioral examination, and prepared a report describing the results of Darlene's examination. Trahan explained that one of his biggest concerns was that Darlene seemed distressed and depressed. According to Trahan's report, Darlene indicated that she was having problems with memory, confusion, disorientation, depression, anxiety, and nervousness. Darlene also reported unusual fears and being afraid of Tillman. According to Trahan, Darlene's psychological factors "were clearly affecting her presentation during the course of [the] examination." Trahan observed that Darlene's "judgment and reasoning were fair, at best[,]" and that Darlene had limited insight concerning some of her circumstances.

Trahan indicated that during the interview, Darlene stated that she could not remember the exact date that she married Tillman. Darlene reported that Tillman dragged her to get married, and Darlene did not want to go. According to Trahan, Darlene stated that Tillman was rude to her and had been taking her money, but Darlene did not know how Tillman was taking her money or how much he had taken. According to Trahan, Darlene stated that her estate was probably worth millions,

17

and at one point, Darlene reported that she had not received any trust funds. Trahan stated that Darlene seemed unaware of how much money she was receiving from her trust, and Darlene did not know where her accounts were. Trahan testified that Darlene also reported that she had been depositing $10,000 of her check into the bank and getting $20,000 cash back, and Darlene did not know what was happening with the money.

Trahan diagnosed Darlene with Dementia NOS, Major Depressive Disorder, Anxiety Disorder, and possible Alzheimer's disease. Trahan explained that Darlene needed to be tested by a neurologist to have a definite diagnosis of Alzheimer's. Trahan reported that Darlene exhibited "clear signs of dementia." Based on his examination, Trahan concluded that, with reasonable neuropsychological certainty, Darlene did not have the cognitive capability to handle her finances or manage her personal affairs. Trahan, noting that it appeared that Darlene had been exploited financially, recommended that the court appoint an individual to handle Darlene's financial affairs to ensure that Darlene's resources are protected and used in her own best interests. According to Trahan, Darlene "is not only exhibiting cognitive problems, but psychological issues that in [his] opinion, render her incapable of making sound judgments[.]" Trahan testified that it was in Darlene's best interest that the trial court appoint a guardian of Darlene's estate and person.

18

Darlene presented her own expert witness at trial. Dr. Mohammad Hamza, a professor and a neuropsychologist, testified that he is a licensed clinical psychologist. Hamza testified that Tillman's attorney requested that he conduct a comprehensive neuropsychological evaluation on Darlene. Hamza tested Darlene over a five-day period in October 2014, which included a clinical interview, mental status exam, and standardized tests for dementia. In January 2015, Hamza conducted an evaluation clinical interview and prepared his report. Hamza explained that the most significant observation he made was that Darlene was depressed and distressed, and Darlene reported that she was agitated due to family conflict.

Hamza testified that based on his evaluation, Darlene does not have significant cognitive and memory impairment or a major neurocognitive disorder that is due to Alzheimer's disease. Hamza stated in his report that his neuropsychological results indicated that Darlene had mild to marginally moderate cognitive deficits, mild memory deficits, and her intellectual ability functioning was below average. Hamza opined that Darlene's neuropsychological status is secondary to the psychopathology state, which has been impacted by family conflict, personal issues, and legal issues. According to Hamza, Darlene's psychological evaluation shows that Darlene has a range of disorder features that have significantly impacted her behaviors, memory, and cognitions.

19

Hamza diagnosed Darlene with Adjustment Disorder with mixed anxiety and depressed mood, Adjustment Disorder, and an Unspecified Neurocognitive Disorder, which is a mild cognitive impairment. According to Hamza, even with a mild neurocognitive deficit, Darlene is still able to handle daily activities and manage her finances and personal affairs. Hamza explained that Darlene was well aware of her finances and has the ability to seek expert advice when needed. Hamza concluded that Darlene is not an incapacitated person, and at the time he tested Darlene, she did not need a guardian. Hamza recommended, among other things, that Darlene see a neurologist for further testing, because a comprehensive neuropsychological evaluation must include a neurologist's opinion to determine what type of dementia Darlene has and if it is treatable.

The record shows that Dr. Sid Epperson, a licensed psychologist who Darlene designated as a non-retained expert, also conducted a psychological evaluation on Darlene. Epperson did not testify at trial, but his psychological report was admitted into evidence. Trahan and Hamza noted in their reports that they had reviewed Epperson's report. Epperson's report indicated that he interviewed Darlene in September 2014, and that an attorney referred Darlene for a psychological evaluation to determine her current level of cognitive functioning. In his report, Epperson indicates that Darlene's intellectual ability falls within the average for adults her age

and her psychological prognosis is fair to good. Epperson diagnosed Darlene with Anxiety Disorder and Cognitive Disorder NOS. According to Epperson's report, Darlene appears to be capable of managing her finances in her own interest, making good financial decisions, and managing her affairs without a guardian.

Darlene also presented the deposition testimony of Dr. Chris Penning, her treating physician. Penning testified that in August 2014, he wrote a letter of competency stating his opinion that Darlene was competent to take care of herself. According to Penning, the only time his records indicate that Darlene was confused or under stress was in 2009, which was shortly after Darlene's husband died. Penning testified that he ordered an MRI of Darlene's brain in August 2011, and the report indicated that Darlene only had age-related changes. Penning explained that at the time of his last visit with Darlene, which was in October 2015, he believed that Darlene was competent to make her own decisions and take care of herself. Penning further explained that he had no opinion concerning whether Darlene was competent to take care of her financial affairs. Penning testified that he dismissed Darlene as a patient, because Darlene became noncompliant after she married Tillman.

The record further shows that in October 2015, the LaFleurs requested the trial court to order Darlene to submit to additional examinations by Gripon and

Trahan, because it had been over a year since the initial court-ordered examinations. In December 2015, the trial court ordered Darlene to submit to an additional psychiatric examination. The jury heard testimony that Darlene violated the trial court's order and refused to submit to the examination.

Darlene testified that she had refused to go for another court-ordered examination because she had been abused by the trial court. Darlene explained that she was sick and dehydrated when she saw Dr. Trahan, and it was wrong that she had to undergo Trahan's examination in that condition. Darlene also explained that she was not interested in attending the court-ordered family visitations, because her children were verbally abusive. According to Darlene, her children were driving her crazy and she was very depressed. Darlene explained that she has dedicated her life to her children and grandchildren, and they had hurt her by seeking a guardianship.

Darlene testified that Tillman is a good husband, and she plans to live in Colmesneil with Tillman for the rest of her life. According to Darlene, prior to Howard taking over her estate, she always paid her bills on time. Darlene explained that she had been good to her children and grandchildren, but they always wanted money. Darlene explained that she will eventually inherit a large amount of money, and she planned to have her accountant help manage her money. According to Darlene, her family is seeking a guardianship because they just want her money.

Tillman testified that in September 2011, he met Darlene at a funeral. According to Tillman, he and Darlene began spending time together, and they became an item[.]" Tillman explained that he decided to marry Darlene, because they were practically living together as husband and wife, and he did not want to be a bad example for the children in their families. According to Tillman, Darlene was excited about planning their wedding, but when Darlene's family opposed the marriage, Darlene became angry and decided to get married without telling anybody. Tillman testified that Darlene wanted to get married despite how her family felt. According to Tillman, he and Darlene have been common-law married since December 2011, and they had been living together for three years when they formally married. Tillman testified that they are happily married.

Tillman testified that in 2012, he became concerned about Darlene's daughter, Paula, because Paula was on Darlene's bank accounts and had written checks to herself. According to Tillman, Darlene's children demanded money all the time, especially Paula's son, Dustin. Tillman explained that Dustin would come three times a day to get envelopes of money. Tillman testified that he and Darlene had a couple of disagreements about the money disbursements, and Tillman would leave when Darlene's family got involved.

According to Tillman, Darlene is independent and capable of conducting her business. Tillman explained that Darlene liked for Tillman to chauffeur her around, which included driving Darlene to the bank. Tillman testified that Darlene routinely went to the bank and withdrew "[c]razy amounts of cash." Tillman explained that he told Darlene that it was not safe for her to walk around with a purse full of cash. Tillman testified that he finally convinced Darlene to scale back to withdrawing less than $10,000 from the bank. Tillman also explained that he talked with Michael about Paula spending so much money, and Tillman convinced Darlene to let Michael help manage Darlene's money. According to Tillman, Michael was in charge for three weeks before Michael stole money from Darlene's savings account. Tillman testified that things did not get any better when Darlene put Buffy in charge of her finances. According to Tillman, Darlene is able to take care of her finances with the help of a professional money manager.

The jury found, by clear and convincing evidence, that Darlene is an incapacitated person because of a mental condition, that it is in the best interest of Darlene to appoint a guardian, and that Darlene's property will be protected by the appointment of a guardian. The jury further found that Darlene lacks the capacity to handle business, managerial, and financial matters, but did not find that Darlene lacks the capacity to operate a motor vehicle, vote in a public election, determine her

24

own residence, or consent to medical, dental, psychological, or psychiatric treatment. The jury also found that the LaFleurs were not qualified to serve as guardians of the estate, and appointed Joshua Heinz to serve as the guardian of Darlene's estate. The trial court entered a final judgment in accordance with the jury's verdict.

## ANALYSIS

In issue one, Darlene asserts that the evidence is factually insufficient to support the jury's findings that Darlene is an incapacitated person; Darlene lacks the capacity to handle business, managerial, and financial affairs; it is in Darlene's best interest for the court to appoint a guardian; and Darlene's property would be protected by such an appointment. According to Darlene, the LaFleurs failed to prove by clear and convincing evidence that Darlene is an "incapacitated person" because of a physical and mental condition that was evident and recurring during the relevant six-month period at issue, which Darlene maintains is within six months of the trial of this matter. Darlene also argues that the LaFleurs failed to prove that she was substantially unable to manage her affairs because of a physical or mental defect. The LaFleurs argue that there was clear and unequivocal evidence from four independent, court-appointed experts, and that the law does not require that the evidence of the condition causing incapacity be established in the six months prior

25

to trial. The LaFleurs argue that, in determining the incapacity of an adult proposed ward, the factfinder may consider evidence beyond the six-month period prior to trial, including a physician's certificate from an examination. According to the LaFleurs, the testimony included evidence of recurring acts or occurrences in the preceding six months and not merely isolated instances of negligence or bad judgment.

The burden of proof needed to appoint a guardian is the "clear and convincing standard," which means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (West Supp. 2017); Tex. Est. Code Ann. § 1101.101(a)(1) (West Supp. 2017). This heightened burden of proof affects the appellate standard of review for factual sufficiency. *In the Interest of CH.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting a factual sufficiency review, we consider whether the evidence rises to the level of clear and convincing, and determine whether, based on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true. *Id.* at 25, 28. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). If, in light of the entire record, the disputed evidence that a

26

reasonable factfinder could have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.* The factfinder is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony. *In the Interest of Boatsman*, 266 S.W.3d 80, 86 (Tex. App.—Fort Worth 2008, no pet.).

Before appointing a guardian, the trial court must find, by clear and convincing evidence, that (1) the proposed ward is an incapacitated person; (2) it is in the proposed ward's best interest to have the court appoint a person as the guardian; (3) the proposed ward's rights or property will be protected by the appointment of a guardian; (4) alternatives to guardianship have been considered and determined not to be feasible; and (5) support and services available to the proposed ward that would avoid the need to appoint a guardian have been considered and determined not to be feasible. Tex. Est. Code Ann. § 1101.101(a)(1). The trial court must also find, by a preponderance of the evidence, that the court has venue of the case, the person to be appointed guardian is eligible to act as guardian and entitled to the appointment, the proposed ward is totally without capacity to manage her property, or lacks the capacity to do some but not all of the tasks necessary to manage her property. *Id.* § 1101.101(a)(2) (West Supp. 2017).

An "incapacitated person" means, among other things, an adult who, because of a physical or mental condition, is substantially unable to manage the individual's own financial affairs. Tex. Est. Code Ann. § 1002.017(2)(c) (West 2014). A determination of incapacity of an adult proposed ward, other than a person who must have a guardian appointed to receive funds from the government, must be evidenced by recurring acts or occurrences in the preceding six months and not by isolated instances of negligence or bad judgment. Tex. Est. Code Ann. § 1101.102 (West 2014). The trial court may not grant an application to create a guardianship of an incapacitated person unless the applicant presents a written letter or certificate from a licensed physician that is dated "not earlier than the 120th day before the date the application is filed[,]" and "based on an examination the physician performed not earlier than the 120th day before the date the application is filed." *Id.* § 1101.103 (West Supp. 2017).

The physician's letter or certificate must describe, among other things, the nature, degree, and severity of the proposed ward's incapacity, including any functional deficits regarding the proposed ward's ability to handle business and managerial matters and to manage financial affairs. *Id.* § 1101.103(b) (West Supp. 2017). The physician's letter must also provide an evaluation of the proposed ward's physical condition and mental functioning and summarize the proposed ward's

28

medical history if reasonably available. *Id.* § 1101.103(b)(3). In providing the evaluation under subsection (3), the physician must state whether improvement in the proposed ward's physical condition and mental functioning is possible, and, if so, state the period after which the proposed ward should be reevaluated to determine whether a guardianship is still necessary. *Id.* § 1101.103(b)(3-a).

If the trial court determines that it is necessary to appoint physicians to examine the proposed ward, the trial court must make the determination at a hearing, and the appointed physicians must examine the proposed ward and issue a physician's letter or certificate that complies with sections 1101.103(a) and (b). *Id.* § 1101.103(c), (d) (West Supp. 2017). We note that section 1101.103 states that the physician's letter or certificate must be dated not earlier than the 120th day before the date the application is filed, not within six months before the hearing date. *See* Tex. Est. Code Ann. § 1101.103. Section 1101.103 only provides that the ward be reevaluated if the physician states that improvement in the proposed ward's physical condition and mental functioning is possible. *Id.* § 1101.103(b)(3-a). Thus, we disagree with Darlene's contention that section 1101.102 limits the factfinder's consideration of evidence regarding incapacity to the six-month period prior to trial.

In this case, the jury heard evidence that Darlene had dementia and did not possess sufficient ability to manage her finances. The jury heard evidence that

Darlene had problems managing her money and was unable to provide information concerning her financial affairs, and that a forensic audit showed that the amount of missing cash from Darlene's account was between $732,280.89 and $1,308,425.84. Several witnesses testified that less restrictive alternatives to a guardianship had been tried, but were unsuccessful. The jury also heard testimony that it was in Darlene's best interest to have a guardianship of her estate established to help Darlene manage her finances and to protect her estate.

Giving due consideration to the evidence that the factfinder could reasonably have found to be clear and convincing, we conclude that the evidence presented at trial was factually sufficient to prove by clear and convincing evidence that Darlene is an incapacitated person, it is in Darlene's best interest to have the court appoint a person as guardian, Darlene's rights and property will be protected by the appointment of a guardian, alternatives to guardianship have been considered and determined not to be feasible, and support and services available to Darlene that would avoid the need to appoint a guardian have been considered and determined not to be feasible. *See In re J.F.C.*, 96 S.W.3d at 266; *see also* Tex. Est. Code Ann. §§ 1101.101(a), 1002.017(2)(c). We overrule issue one.

In issue two, Darlene complains that the trial court abused its discretion by excluding evidence concerning whether Darlene's refusal to follow the trial court's

orders constituted evidence of mental incapacity. Darlene argues that the trial court erred by excluding Hamza's testimony as rebuttal to the LaFleurs' contention that Darlene is mentally incapacitated because she refused to attend family visitations and submit to a psychiatric examination. According to Darlene, the LaFluers' counsel argued during trial and closing argument that Darlene's refusal to comply with the court's orders was against her own best interest and constituted evidence of her incapacity.

We review a trial court's decision to exclude evidence for an abuse of discretion. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527-28 (Tex. 2000). In determining whether the trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding principles or rules. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A trial court does not abuse its discretion as long as some evidence of substantive and probative character exists to support the trial court's decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002); *Ayala v. Ayala*, 387 S.W.3d 721, 728 (Tex. App.— Houston [1st Dist.] 2011, no pet.).

The record shows that the jury heard testimony from several witnesses regarding Darlene's refusal to submit to a court-ordered psychiatric examination and attend family visitations. When Darlene attempted to present rebuttal testimony from

31

Hamza, the LaFleurs objected based on Darlene's failure to designate Hamza on the issue of whether the court-ordered family visitations were appropriate. The record shows that Darlene's counsel made a bill of exception regarding the excluded testimony, during which Hamza testified that he reviewed audio recordings of the family visitations. The LaFleurs reurged their objection that Darlene had failed to designate Hamza on the issue and argued that Darlene's failure to give prior notice that Hamza had reviewed the audio recordings and would offer testimony concerning the family visitations would be unfair and prejudicial. The trial court sustained the LaFleurs' objection.

Rule 194.2(f) of the Texas Rules of Civil Procedure provides that upon request, a party may obtain disclosure concerning the general substance of a testifying expert's mental impressions and opinions, as well as all documents and tangible things that have been provided to or reviewed by the expert in anticipation of the expert's testimony. Tex. R. Civ. P. 194.2(f). The purpose of Rule 194.2(f) is to give the opposing party sufficient information about the expert's opinions to allow the opportunity to prepare for a meaningful cross-examination and expert rebuttal evidence. *Pro Plus, Inc. v. Crosstex Energy Servs., L.P.*, 388 S.W.3d 689, 705 (Tex. App.—Houston [1st Dist.] 2012), *aff'd*, 430 S.W.3d 384 (Tex. 2014). Rule 193.6 provides that a party who fails to amend or supplement a discovery response in a

32

timely manner may not introduce in evidence the material or information that was not timely disclosed unless the court finds that there was good cause for the failure to timely amend or supplement or that such failure will not unfairly surprise or prejudice the other party. Tex. R. Civ. P. 193.6(a). The burden of establishing the good cause or lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence, and a finding of the lack of unfair surprise or prejudice must be supported by the record. Tex. R. Civ. P. 193.6(b).

The clerk's record shows that Darlene's designation of expert witnesses stated that Hamza may be called upon to give testimony in the form of opinions within the scope of his expertise concerning the psychiatric and psychological condition of Darlene. The designation further states that Hamza had relied upon Darlene's medical and psychological records, his meetings with Darlene, depositions, sworn testimony in the case and psychological testing, as well as his psychological knowledge and expertise. Based on our review of the clerk's record, Darlene never amended or supplemented her designation of expert witnesses to disclose that Hamza had relied upon audio recordings of the family visitations and might be called upon to give an opinion concerning the visitations he reviewed. The record does not support a finding of the lack of unfair surprise or prejudice. *See* Tex. R. Civ. P. 193.6(b). We therefore conclude that the trial court did not abuse its discretion by

excluding Hamza's rebuttal testimony. We overrule issue two and affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on January 4, 2018
Opinion Delivered March 15, 2018

Before McKeithen, C.J., Horton and Johnson, JJ.