# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00429-CV

---

**David F. Henges, Appellant**

**v.**

**Leslie Henges Dolliver, Limited Guardian of the Person and
Full Guardian of the Estate for David Henges, Appellee**

---

**FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY
NO. C-1-PB-19-000860, THE HONORABLE GUY S. HERMAN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This is an appeal from the probate court's order finding David Faulkner Henges incapacitated and appointing his daughter, Leslie Henges Dolliver, permanent guardian with limited authority over his person and with full authority of his estate. In one issue, Henges asserts that the probate court abused its discretion by disregarding alternatives to guardianship and imposing a guardianship. We will affirm the probate court's order.

## BACKGROUND

Henges is a retired orthopedic surgeon. After his wife died in 2009, Henges lived with Dolliver and her family for approximately ten years. In 2014, after Henges recovered from a bout of double pneumonia and a cardiac event that triggered his defibrillator pacemaker, Dolliver and her sister observed what they believed to be unusual and concerning behaviors on his part, specifically a change in Henge's handling of his retirement investments. At Dolliver's

urging, Henges submitted to a neurological evaluation, which resulted in a diagnosis of mild dementia. In 2015, the family updated Henges's formal estate-planning documents, which included a durable power of attorney and a medical power of attorney that named Dolliver and her sister as co-agents. In 2018, Henges suffered what he believed to be a heart attack and was hospitalized. After the hospitalization and a range of diagnostic procedures, his treating physicians determined that he had an issue with his gall bladder. Dolliver observed that the diagnostic procedures, which included three anesthesias, were difficult for Henges to tolerate and she believed caused Henges to have a diminished ability to care for himself. Dolliver and her sister determined that it was necessary to move Henges to a nearby assisted living facility. Henges lived in that facility for approximately six months until early 2019 when he moved to the newly opened Belmont Village, where he currently resides.

In March 2019, Dolliver and her sister filed a joint application for limited guardianship of Henges's person. The application alleged that Henges, who was then eighty-one years old, had been diagnosed with vascular dementia with delusions and that his condition was such that he was incapable of managing his personal, medical, legal, and financial affairs. The application alleged that an existing management trust created and funded pursuant to a Statutory Durable Power of Attorney granted to Dolliver was at that time a less restrictive alternative to guardianship of Henges's estate, but that an existing Medical Power of Attorney had proved insufficient to protect Henges from making decisions against his own interest. The application further alleged that Henges refuses medical advice and treatments from his doctors and threatens to revoke the Medical Power of Attorney, and that Henge's physician, Dr. Matthew Freeman, advised Dolliver to seek guardianship of Henges's person because the physician was no longer comfortable relying on the authority granted by the Medical Power of Attorney.

2

The application was supported by a report from Dr. Freeman, a neuropsychologist, who stated that Henges had been diagnosed with mild cognitive impairment and suspected dementia in 2014 by Dr. Bertelson, who Henges replaced with Dr. Devere because Henges disagreed with the diagnosis. Dr. Devere confirmed the diagnosis, prescribed an Exelon patch, and conducted an additional test to determine "if Alzheimers was part of the problem." Dr. Freeman stated that the results of that test showed a "strong likelihood of Alzheimers," but that Henges did not return for visits with his neurologist from 2015 to 2018. When his Exelon prescription ran out, Henges contacted an old friend who was a neurologist, Dr. Phil Leonard. Dr. Freeman stated that Dr. Leonard refilled the prescription for a couple of years without personally evaluating Henges and that Dr. Leonard's Texas medical license had been revoked by the Texas Medical Board in June 2018.

Dr. Freeman reported that Henges underwent a cognitive evaluation in August 2018 and that after reviewing that evaluation and the totality of the testing done over the past five years, and after conducting multiple personal interviews, he believed that Henges is an "extreme case" who refuses to accept his diagnosis and has made an appointment with yet another neurologist. Dr. Freeman stated that although Henges had appointed Dolliver and her sister as his co-agents on his medical power of attorney, he is "very combative with them and refuses to give up the drivers' license that he managed (with the help of a well-meaning friend) to get replaced in February [2019]." Dr. Freeman recommended that the daughters seek a guardianship so they could prevent him from driving, which presents a danger to himself and others, and so that they could prevent Henges from following through on his threat to revoke the medical power of attorney if they do not follow his wishes. Dr. Freeman opined that Henges is "impaired and needs to ultimately have someone in charge of making sound medical

3

decisions for him." The application was also supported by Dr. Freeman's Certificate of Medical Examination in which he diagnosed Henges with vascular dementia with delusions with a prognosis of gradual continued progression.

In response to the application, Henges retained an attorney, Don Ford, to represent him and requested that the court appoint Ford as Henges's guardian ad litem and stated that he opposed the guardianship because he was not incapacitated and, even if found to be incapacitated, available supports and services were sufficient to avoid the need for a guardianship.

At a September 2019 hearing on the application, the court heard testimony that focused on the issues of Henges's residence, medical care, and desire to continue driving. At the time, Dolliver did not seek guardianship of Henges's estate because she believed the management trust provided sufficient protection, specifically because the brokerage firm "ha[d] the dementia diagnosis on file" and knew to call her if there was unusual activity. Dr. Freeman testified about his diagnosis of mild vascular dementia with "a possible component of Alzheimer's disease." He stated that he had witnessed Henges having "delusional thoughts in clinic," which he described as "firmly held false beliefs." Dr. Freeman testified that his diagnosis was consistent with the reports of other neurologists who had examined Henges.

The court heard testimony from Dr. Edward Gripon, a forensic psychiatrist, who opined that Henges was not incapacitated. He testified that Henges was no more vulnerable to being taken advantage of than other people and that Henges was capable of administering his own medication, although he agreed that Henges "may not agree with all of them" and that Henges might not take medications prescribed for dementia if he did not agree with the diagnosis. Dr. Gripon testified that Henges did not want to continue to live at Belmont Village

4

and wants to go back to a less restrictive environment. After Dr. Gripon finished testifying, the court recessed the hearing.

After the hearing, Dolliver filed a motion asking the court to appoint Dr. Jason Schillerstrom to perform an independent medical examination. *See* Tex. Est. Code § 1101.103 (providing that if court determines it is necessary, court may appoint physician to examine proposed ward). Henges agreed to the examination and the parties also agreed that Henges would not drive a car while the case was pending and would be accompanied by a representative of a temporary guardian service at all medical appointments. Dr. Schillerstrom performed the medical evaluation and submitted a report to the court. Dr. Schillerstrom's evaluation of Henges's mental functioning included a diagnosis of "Major Neurocognitive Disorder, secondary to cerebrovascular disease" of mild severity with a poor prognosis. He stated that it would be in Henges's best interest to be placed in a secure facility for the elderly or in a secure nursing facility that specialized in the care and treatment of people with dementia. Dr. Schillerstrom also stated that Henges did not have sufficient capacity to give informed consent to the administration of dementia medication, which he found would be in Henges's best interest to take. Dr. Schillerstrom found that Henges had deficits in short-term memory, problem solving, reasoning logically, grasping abstract aspects of his situation, and breaking down complex tasks into simple tasks and carrying them out. Finally, while Dr. Schillerstrom concluded that Henges could attend to basic activities of daily living, such as bathing and dressing, he was not able to initiate and make responsible decisions regarding complex financial decisions, managing a bank account, operating a motor vehicle, consenting to medical treatment, or determining his own residence.

Thereafter, Dolliver amended the application to seek guardianship not only of Henges's person, but also of his estate. Dolliver alleged that "it has become apparent that certain assets cannot be adequately protected or managed using a trust or other less restrictive means" and that Henges had repeatedly told Dolliver that she had gone beyond the power he granted her in the Statutory Durable Power of Attorney in 2015 and threatened to revoke it. Dolliver also alleged that after she received an alert about account activity related to Henges's Roth IRA, the financial institution holding the account "made it clear to her that in order to protect [Henges] from being able to take a distribution from his Roth IRA account, they would need a court order or authority from a legal guardian of [Henges's] estate."

The probate court resumed the hearing on the guardianship application in May 2020. The court heard testimony from Dr. Schillerstrom, Dolliver, and Henges, and Dr. Gripon gave additional testimony. The court formally received the written report of its court investigator, who concluded that, based on the medical evidence, less restrictive alternatives to the appointment of a guardian of Henges's person and estate were not feasible or appropriate. Dr. Schillerstrom testified that the natural course of Henges's illness made it increasingly difficult for him to make reasonable choices and that his deficiencies in "executive functioning" affected "things like financial oversight [and] medication management." Dr. Schillerstrom emphasized that executive function, rather than memory, is what predicts a person's ability to care for one's self and that Henges's deficient executive function impeded him from making complicated business or financial decisions for himself.

The day after the hearing concluded, the court announced its ruling that, based on a review of the record, it found by clear and convincing evidence that Henges was partially incapacitated and that, "although he is pretty close to being totally incapacitated, he does have

6

the ability to vote, and I'll let him have the right to vote."  The court stated that it would be granting a limited guardianship of the person and a full guardianship of the estate.  The court signed an order appointing Dolliver guardian of Henges's person with limited authority and guardian of Henges's estate with full authority.  The court ordered that Dolliver post a $700,000 bond, that Henges be allowed to manage a personal allowance of $300 per month for personal expenditures, and that Dolliver submit annual reports of the person and an annual account to the court.  At Henges's request, the court filed findings of fact and conclusions of law.  Henges then perfected this appeal.

## DISCUSSION

The Legislature has determined that a court shall appoint a guardian for a person other than a minor according to the circumstances and considering the best interests of the ward. Tex. Est. Code § 1104.101.  Before appointing a guardian, the court must find by clear and convincing evidence that:  (1) the ward is an incapacitated person; (2) it is in the best interest of the ward to have the court appoint a guardian; (3) the rights of the ward or the ward's property will be protected by the appointment of a guardian; and (4) alternatives to guardianship and supports and services available have been considered and determined to be infeasible.  *Id.* § 1101.101(a)(1).  The probate court made the following findings of fact and conclusions of law:

> FOF 5:  At trial on September 26, 2019, the testimony indicated that the alternatives to guardianship currently allowing [Dolliver] to manage [Henges's] personal and medical care, including the Medical Power of Attorney, were no longer protecting [Henges].  For example, [Henges] would diagnose himself with a condition, then order medications and hide them in his room at Belmont Village, against the rules and against the medical advice of his treating physicians. [Henges] also insists on dosing his own medications, a practice that was against medical advice, against the rules at Belmont, and which the testimony indicated risked damage to his heart.  Finally, [Henges] had at times made threats to revoke his Medical Power of Attorney.

7

FOF 6: Dr. Blake Freeman, a neurologist and one of [Henges's] treating physicians, testified as the expert witness for [Dolliver] and [Dolliver's sister]. Dr. Freeman determined that [Henges] suffers from vascular dementia, which causes cognitive deficits and executive dysfunctions. According to Dr. Freeman, [Henges] does not have the cognitive ability [to] make his own financial decisions, manage his medications and medical care, or operate a motor vehicle. Dr. Freeman, as one of [Henges's] treating physicians, has performed extensive medical testing and reviewed a multitude of medical records. Dr. Freeman confirmed to this Court that several other neurologists concurred with Dr. Freeman's diagnosis of [Henges]. The Court found Dr. Freeman's testimony in this case to be credible.

FOF 7: Dr. Edward Gripon testified that he interviewed [Henges] for approximately two or three hours and reviewed medical records provided by [Henges]. Dr. Edward Gripon concluded that [Henges] suffers little cognitive impairment.

FOF 10: During the pause in trial after September 26, 2019, [Henges] acted in ways that jeopardized his retirement accounts. In addition, [Dolliver] was unable with her existing authority to fully protect the monthly income from [Henges's] veteran's pension.

FOF 18: Dr. Jason Schillerstrom, the neurologist chosen by the Court, testified about his examination of [Henges] and his diagnosis of major neurocognitive disorder, secondary to cerebrovascular disease. Dr. Schillerstrom determined that [Henges] had lost his executive functioning abilities, which left him unable to make complex decisions for himself, determine his residence, make medical decisions, or drive a motor vehicle, among other things. The Court found Dr. Schillerstrom's testimony to be credible.

FOF 19: Dr. Edward Gripon again testified that [Henges] suffered little cognitive impairment. The Court was not persuaded by Dr. Gripon's testimony in this case.

FOF 20: [Henges] testified to his belief that he has been misdiagnosed by multiple doctors and to his belief that he does not suffer from any cognitive impairment. [Henges] testified that he wants to purchase and drive a car and purchase a home to live in by himself. [Henges] was adamant about his right to vote.

FOF 21a: [Henges] is a partially incapacitated person without capacity to care for himself, to manage his property, to make personal decisions regarding his residence, and to operate a motor vehicle.

FOF 21c: Alternatives to guardianship and support and services available to [Henges] that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible.

8

FOF 22c: [Henges] lacks capacity to do some, but not all, of the tasks necessary to care for himself with or without supports and services as indicated by his mental and physical limitations as evidenced by recurring acts within the preceding six months and continuing to this date.

FOF 22d: [Henges] lacks sufficient capacity with supports and services to make personal decisions regarding his residence, operating a motor vehicle, and marriage.

On appeal, Henges does not challenge the probate court's findings related to Henges's capacity to care for himself or to make medical or financial decisions. Rather, he asserts only that the court "abused its discretion by disregarding alternatives to guardianship" and challenges the court's finding that alternatives to guardianship either do not exist or are insufficient to protect his interests. Henges argues that the lesser restrictive alternatives to guardianship that the court "disregarded" include a medical power of attorney, a durable power of attorney, and a family limited partnership and trust.

Dolliver counters that the evidence and the record demonstrate that the family has attempted and exhausted the alternatives to guardianship. She maintains that the court heard evidence from an independent geriatric psychiatrist, considered the report of its court investigator, and heard testimony from Henges and other physicians about alternatives to guardianship. Dolliver asserts that the probate court was within its discretion to determine that the proposed alternatives to guardianship were no longer feasible or sufficient to protect Henges's interests.

### Standard of Review

We review an order imposing a guardianship for an abuse of discretion. *In re Guardianship of Boatsman*, 266 S.W.3d 80, 88 (Tex. App.—Fort Worth 2008, no pet.). "In guardianship proceedings especially, the heavy responsibility for determining the best resolution

9

of fundamental and emotional issues lies necessarily within the trial court's sound discretion." *In re Thetford*, 574 S.W.3d 362, 380 (Tex. 2019). This Court's review of such a proceeding must be "singularly mindful of the trial court's unique opportunity and responsibility to assess the circumstances presented." *Id.* A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

In guardianship proceedings, legal and factual sufficiency of the evidence are not independent, reversible grounds of error; instead, they are factors to consider in assessing whether there was an abuse of discretion. *In re Guardianship of A.E.*, 552 S.W.3d 873, 877 (Tex. App.—Fort Worth 2018, no pet.). Because the required findings in a guardianship proceeding must be supported by clear and convincing evidence, in a legal sufficiency review, we view the evidence in the light most favorable to the trial court's decision to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re Boatsman*, 266 S.W.3d at 85-86. In the legal sufficiency context, an abuse of discretion does not occur when the trial court's decision is based on conflicting evidence. *In re A.E.*, 552 S.W.3d at 877.

In addressing a factual sufficiency challenge, we must consider all the evidence in the record—both in support of and contrary to the trial court's findings—to determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the finding. *In re*

10

*Boatsman*, 266 S.W.3d at 86. If the disputed evidence is so significant that a factfinder could not have formed a firm belief or conviction in the truth of the trial court's findings, then the evidence is factually insufficient. *Id.* The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *See In re C.H.*, 89 S.W.3d 17, 27-29 (Tex. 2002).

The Texas Estates Code defines "alternatives to guardianship" to include the following:

> (1) execution of a medical power of attorney under Chapter 166, Health and Safety Code;
>
> (2) appointment of an attorney in fact or agent under a durable power of attorney as provided by Subtitle P, Title 2;
>
> (3) execution of a declaration for mental health treatment under Chapter 137, Civil Practice and Remedies Code;
>
> (4) appointment of a representative payee to manage public benefits;
>
> (5) establishment of a joint bank account;
>
> (6) creation of a management trust under Chapter 1301;
>
> (7) creation of a special needs trust;
>
> (8) designation of a guardian before the need arises under Subchapter E, Chapter 1104; and
>
> (9) establishment of alternate forms of decision-making based on person-centered planning.

Tex. Est. Code § 1002.0015. Henges argues that his current estate planning arrangements constitute "alternatives to guardianship" sufficient to avoid a guardianship of his estate. Specifically, Henges points to a financial power of attorney that he has executed as well as the trust and family partnership he created as part of his estate planning. Henges asserts that the trial

11

court's finding that these were no longer feasible alternatives to guardianship of his estate was not supported by clear and convincing evidence. With regard to guardianship of his person, Henges argues that the principal concern articulated at trial was that he was no longer able to safely operate a motor vehicle, administer medications and make decisions about his medical treatment, or address personal hygiene issues related to incontinence. Henges argues that reasonable alternatives to guardianship exist to address these concerns, including the Texas Department of Public Safety's medical review process and a medical power of attorney he has executed. Henges contends that the trial court's finding that these were not reasonable alternatives to a guardianship of his person was not supported by clear and convincing evidence.

### *Guardianship of Henges's Estate*

Evidence was presented at trial that the majority of Henges's financial assets, including real estate and a brokerage account, are held in a family partnership and trust that he created in 2015. The trust does not, however, include Henges's IRA retirement account or the military retirement benefits he receives monthly. Henges argues on appeal that, although the court has found him to be incapacitated, alternatives to guardianship exist that would sufficiently protect the financial assets that are not included in the family partnership and trust. Henges asserts that Dolliver could manage those funds using her power of attorney and that the funds could be deposited in a bank account held jointly by Dolliver and Henges. Dolliver testified, however, that either of these alternatives would leave Henges with formal legal authority to make financial decisions about these funds. Dolliver testified that as a joint bank account holder or a person with Henges's power of attorney, her authority would be limited to offering advice to Henges. Dolliver stated that by May 2020, the power of attorney was no longer a feasible alternative because an independent geriatric psychiatrist had determined that Henges lacked the

12

capacity to make complex business decisions. She testified that the financial institution holding Henges's IRA retirement account informed her that without a guardianship in place if Henges "decided he wanted to have all that money withdrawn they would have no choice but to allow him to do that." Dolliver testified that Henges had begun hiding things from her and her sister and had recently set up a new cell phone account to prevent her from having access to his phone records. Dolliver stated that Henges had told her he wanted to buy a car and a house. At trial, Henges state that he wanted to "get the hell out of" the assisted living facility and wanted to "go and buy my own damn place and run it." In light of this testimony, a reasonable factfinder could have formed a firm conviction or belief that a power of attorney would be inadequate to provide the oversight needed to protect Henges's financial assets given his inability to make complex financial decisions. *See In re Guardianship of Bruner*, No. 05-18-01006-CV, 2019 WL 2912236, at \*3 (Tex. App.—Dallas July 8, 2019, no pet.) (mem. op.) (concluding that power of attorney was not feasible alternative to guardianship of incapacitated person because power of attorney would not provide complete control of money). The power of attorney would only permit Dolliver to effectuate Henges's wishes, not to override them.

The evidence supports the court's determination that a joint checking account would not be a feasible alternative to guardianship to protect Henges's monetary assets. Again, the court heard testimony that Henges lacks capacity to make financial decisions or manage a bank account. There was testimony that Henges routinely carries large sums of cash and that he has begun freely sharing personal financial information with strangers. Dr. Schillerstrom testified that Henges's condition made him particularly vulnerable to malfeasance of third parties. Dolliver testified that, without a guardianship in place, if Henges decided he wanted to withdraw all his money from a financial institution that institution would have no choice but

13

to allow him to do that. A joint checking account would only provide Dolliver with access to Henges's funds, it would not allow her to protect the funds from his impaired decision making. The court could reasonably have formed a firm belief or conviction that a joint checking account was not a feasible alternative to a guardianship and would be insufficient to protect Henges's financial assets.

*Guardianship of Henges's Person*

There was testimony at trial that Henges could not operate a motor vehicle safely. Henges testified that he wanted to purchase a car and drive it. On appeal, Henges asserts that the Texas Department of Public Safety's review process is a reasonable alternative to guardianship of his person and would adequately protect him and others from any danger related to his operation of a motor vehicle. Henges maintains that because the DPS review process operates independently of a guardianship and does not require a judicial finding of incapacity to refuse to renew a driver's license, that process constitutes a feasible less restrictive alternative to guardianship. Henges does not challenge the court's finding, based on the testimony of Dr. Freeman and Dr. Schillerstrom, that he can no longer safely operate a motor vehicle. Instead, he asserts that the DPS can evaluate his fitness to drive and, consequently, guardianship is not necessary.

The Texas Estates Code expressly provides that the probate court must determine "whether the proposed ward lacks the capacity . . . to make personal decisions regarding . . . operating a motor vehicle." Tex. Est. Code § 1101.101(c). Thus, the Legislature intended for the probate court, not the Texas Department of Public Safety, to determine whether a proposed ward has the capacity to drive. For its part, the DPS is required to defer to a judicial determination of capacity. *See* Tex. Transp. Code §§ 521.319(a) ("A person may not operate a

14

motor vehicle if the person: . . . (2) has been determined by a judgment of a court to be totally incapacitated or incapacitated to act as the operator of a motor vehicle."); .319(d) (mechanism for court to notify agency of incapacity finding); .201 (department prohibited from issuing new license to person found by court to be incapacitated). The statutory framework provides that the probate court assess cognitive capacity and decision-making, whereas the DPS's review process addresses a range of medical conditions, including vision problems, reflex insufficiency, or the risk of a sudden loss of consciousness. *See, e.g.*, 37 Tex. Admin. Code §§ 15.51 (Tex. Dep't of Pub. Safety, Vision Tests); 15.57 (Tex. Dep't of Pub. Safety, Restrictions, Physical). It is not the purview of the DPS to evaluate or make a determination on whether an applicant has the cognitive capacity to make a personal decision regarding whether or not to drive. Instead, the Texas Estates Code requires that the probate court imposing a guardianship must specifically address the ward's capacity to operate a motor vehicle in its order. Tex. Est. Code § 1101.101(c). The court did not abuse its discretion in finding by clear and convincing evidence that the DPS review process was not a feasible alternative to guardianship with respect to Henges's desire to operate a motor vehicle.

Henges also argues on appeal that the existing medical power of attorney is a feasible alternative to guardianship even though he has been found to lack capacity to manage his medications and make decisions about his medical care. But a medical power of attorney can be revoked "at any time . . . without regard to whether the principal is competent or the principal's mental state." *See* Tex. Health & Safety Code § 166.155(a)(1). Even if it were not revoked, however, the court found that the medical power of attorney was not a feasible alternative to a guardianship in this case, and the evidentiary record supports this finding. There was evidence that Henges made independent decisions about what medications he would take

15

that were contrary to the advice of his treating physicians, that Henges purchased and hid medications in his room, and that he took medications that risked damage to his heart. Dolliver testified that the existing medical power of attorney provides her with a way to carry out Henges's wishes, but not to guide them or oversee those decisions. *See id.* § 166.164 (statutory form for medical power of attorney provides that "Your agent is obligated to follow your instructions when making decisions on your behalf."). Henges testified that he had been "misdiagnosed" by six neurologists and psychiatrists and there was evidence that he sought out medical opinions that would confirm his belief that he did not have any cognitive or executive function impairment. The court could reasonably have formed a firm belief or conviction that a medical power of attorney would not protect Henges from physical harm resulting from his refusal to follow the medical advice of his treating physicians and in fact to contravene it.

### *Available Supports and Services as Alternative to Guardianship*

Finally, Henges asserts that the probate court abused its discretion in finding that the supports and services available to Henges were not a feasible alternative to guardianship. *See* Tex. Est. Code § 1101.101(1)(E) (before appointing guardian court must find by clear and convincing evidence that supports and services available that would avoid need for appointment of guardian have been considered and determined not to be feasible). Henges argues that Dolliver's and her sister's involvement and participation in his life is a support and service that is a feasible alternative to guardianship and would continue to effectively protect his interests. The evidence at trial, however, belies this assertion. Dolliver testified that although her support and assistance had, in the past, been sufficient, over time Henges has resisted her efforts to coordinate his medical appointments and care. Dolliver also testified that Henges had directed certain service providers not to communicate with her and had threatened to revoke the medical

power of attorney. There was testimony that Henges has become increasingly resistant to efforts to treat what several physicians have described as a progressing cognitive impairment. Dolliver testified that she is no longer able to sufficiently manage either Henges's estate or his person without having the formal authority of a guardianship and that she required the authority that would permit her to receive and provide instructions related to Henges's financial matters and medical needs. A trier of fact could reasonably have formed a firm belief or conviction that continuing the status quo and relying on Dolliver's and her sister's support and services was no longer a feasible alternative to a guardianship. The probate court did not abuse its discretion in making that finding.

## CONCLUSION

For the reasons stated in this opinion, we conclude that the probate court did not abuse its discretion by disregarding alternatives to guardianship that would avoid the need for the appointment of a guardian. The evidence supports the court's finding by clear and convincing evidence that the alternatives to guardianship were not feasible. Accordingly, we overrule Henges's sole appellate issue and affirm the probate court's guardianship order.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed: December 8, 2021

17